(Slip Opinion) OCTOBER TERM, 2009 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FREE ENTERPRISE FUND ET AL. *v.* PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 08–861. Argued December 7, 2009—Decided June 28, 2010

Respondent, the Public Company Accounting Oversight Board, was created as part of a series of accounting reforms in the Sarbanes-Oxley Act of 2002. The Board is composed of five members appointed by the Securities and Exchange Commission. It was modeled on private self-regulatory organizations in the securities industry—such as the New York Stock Exchange—that investigate and discipline their own members subject to Commission oversight. Unlike these organizations, the Board is a Government-created entity with expansive powers to govern an entire industry. Every accounting firm that audits public companies under the securities laws must register with the Board, pay it an annual fee, and comply with its rules and oversight. The Board may inspect registered firms, initiate formal investigations, and issue severe sanctions in its disciplinary proceedings. The parties agree that the Board is "part of the Government" for constitutional purposes, *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 397, and that its members are " 'Officers of the United States' " who "exercis[e] significant authority pursuant to the laws of the United States," *Buckley* v. *Valeo*, 424 U. S. 1, 125–126. While the SEC has oversight of the Board, it cannot remove Board members at will, but only "for good cause shown," "in accordance with" specified procedures. §§7211(e)(6), 7217(d)(3). The parties also agree that the Commissioners, in turn, cannot themselves be removed by the President except for " 'inefficiency, neglect of duty, or malfeasance in office.' " *Humphrey's Executor* v. *United States*, 295 U. S. 602, 620.

The Board inspected petitioner accounting firm, released a report critical of its auditing procedures, and began a formal investigation.

2        FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
              ACCOUNTING OVERSIGHT BD.

                          Syllabus

The firm and petitioner Free Enterprise Fund, a nonprofit organiza-
tion of which the firm is a member, sued the Board and its members,
seeking, *inter alia,* a declaratory judgment that the Board is uncon-
stitutional and an injunction preventing the Board from exercising its
powers.  Petitioners argued that the Sarbanes-Oxley Act contravened
the separation of powers by conferring executive power on Board
members without subjecting them to Presidential control.  The basis
for petitioners' challenge was that Board members were insulated
from Presidential control by two layers of tenure protection: Board
members could only be removed by the Commission for good cause,
and the Commissioners could in turn only be removed by the Presi-
dent for good cause.  Petitioners also challenged the Board's ap-
pointment as violating the Appointments Clause, which requires offi-
cers to be appointed by the President with the Senate's advice and
consent, or—in the case of "inferior Officers"—by "the President
alone, . . . the Courts of Law, or . . . the Heads of Departments,"
Art. II, §2, cl. 2.  The United States intervened to defend the statute.
The District Court found it had jurisdiction and granted summary
judgment to respondents.  The Court of Appeals affirmed.  It first
agreed that the District Court had jurisdiction.  It then ruled that the
dual restraints on Board members' removal are permissible, and that
Board members are inferior officers whose appointment is consistent
with the Appointments Clause.

*Held*:

   1. The District Court had jurisdiction over these claims.  The
Commission may review any Board rule or sanction, and an ag-
grieved party may challenge the Commission's "final order" or "rule"
in a court of appeals under 15 U. S. C. §78y.  The Government reads
§78y as an exclusive route to review, but the text does not expressly
or implicitly limit the jurisdiction that other statutes confer on dis-
trict courts.  It is presumed that Congress does not intend to limit ju-
risdiction if "a finding of preclusion could foreclose all meaningful ju-
dicial review"; if the suit is "'wholly "collateral"' to a statute's review
provisions"; and if the claims are "outside the agency's expertise."
*Thunder Basin Coal Co.* v. *Reich*, 510 U. S. 200, 212–213.

   These considerations point against any limitation on review here.
Section 78y provides only for review of *Commission* action, and peti-
tioners' challenge is "collateral" to any Commission orders or rules
from which review might be sought.  The Government advises peti-
tioners to raise their claims by appealing a Board sanction, but peti-
tioners have not been sanctioned, and it is no "meaningful" avenue of
relief, *Thunder Basin, supra,* at 212, to require a plaintiff to *incur* a
sanction in order to test a law's validity, *MedImmune, Inc.* v. *Genen-
tech, Inc.*, 549 U. S. 118, 129.  Petitioners' constitutional claims are

also outside the Commission's competence and expertise, and the statutory questions involved do not require technical considerations of agency policy. Pp. 7–10.

2. The dual for-cause limitations on the removal of Board members contravene the Constitution's separation of powers. Pp. 10–27.

(a) The Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America." Art. II, §1, cl. 1. Since 1789, the Constitution has been understood to empower the President to keep executive officers accountable—by removing them from office, if necessary. See generally *Myers* v. *United States*, 272 U. S. 52. This Court has determined that this authority is not without limit. In *Humphrey's Executor, supra,* this Court held that Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause. And in *United States* v. *Perkins*, 116 U. S. 483, and *Morrison* v. *Olson*, 487 U. S. 654, the Court sustained similar restrictions on the power of principal executive officers—themselves responsible to the President—to remove their own inferiors. However, this Court has not addressed the consequences of more than one level of good-cause tenure. Pp. 10–14.

(b) Where this Court has upheld limited restrictions on the President's removal power, only one level of protected tenure separated the President from an officer exercising executive power. The President—or a subordinate he could remove at will—decided whether the officer's conduct merited removal under the good-cause standard. Here, the Act not only protects Board members from removal except for good cause, but withdraws from the President any decision on whether that good cause exists. That decision is vested in other tenured officers—the Commissioners—who are not subject to the President's direct control. Because the Commission cannot remove a Board member at will, the President cannot hold the Commission fully accountable for the Board's conduct. He can only review the Commissioner's determination of whether the Act's rigorous good-cause standard is met. And if the President disagrees with that determination, he is powerless to intervene—unless the determination is so unreasonable as to constitute "'inefficiency, neglect of duty, or malfeasance in office.'" *Humphrey's Executor*, *supra,* at 620.

This arrangement contradicts Article II's vesting of the executive power in the President. Without the ability to oversee the Board, or to attribute the Board's failings to those whom he *can* oversee, the President is no longer the judge of the Board's conduct. He can neither ensure that the laws are faithfully executed, nor be held responsible for a Board member's breach of faith. If this dispersion of re-

4        FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
            ACCOUNTING OVERSIGHT BD.

                        Syllabus

sponsibility were allowed to stand, Congress could multiply it further by adding still more layers of good-cause tenure. Such diffusion of power carries with it a diffusion of accountability; without a clear and effective chain of command, the public cannot determine where the blame for a pernicious measure should fall. The Act's restrictions are therefore incompatible with the Constitution's separation of powers. Pp. 14–17.

(c) The " 'fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. " *Bowsher* v. *Synar*, 478 U. S. 714, 736. The Act's multilevel tenure protections provide a blueprint for the extensive expansion of legislative power. Congress controls the salary, duties, and existence of executive offices, and only Presidential oversight can counter its influence. The Framers created a structure in which "[a] dependence on the people" would be the "primary controul on the government," and that dependence is maintained by giving each branch "the necessary constitutional means and personal motives to resist encroachments of the others." The Federalist No. 51, p. 349. A key "constitutional means" vested in the President was "the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Congress 463. While a government of "opposite and rival interests" may sometimes inhibit the smooth functioning of administration, The Federalist No. 51, at 349, "[t]he Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher*, *supra,* at 730. Pp. 17–21.

(d) The Government errs in arguing that, even if some constraints on the removal of inferior executive officers might violate the Constitution, the restrictions here do not. There is no construction of the Commission's good-cause removal power that is broad enough to avoid invalidation. Nor is the Commission's broad power over Board *functions* the equivalent of a power to remove Board *members*. Altering the Board's budget or powers is not a meaningful way to control an inferior officer; the Commission cannot supervise individual Board members if it must destroy the Board in order to fix it. Moreover, the Commission's power over the Board is hardly plenary, as the Board may take significant enforcement actions largely independently of the Commission. Enacting new SEC rules through the required notice and comment procedures would be a poor means of micromanaging the Board, and without certain findings, the Act forbids any general rule requiring SEC preapproval of Board actions. Finally, the Sarbanes-Oxley Act is highly unusual in committing substantial executive authority to officers protected by two layers of good-cause removal. Pp. 21–27.

3. The unconstitutional tenure provisions are severable from the remainder of the statute. Because "[t]he unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions," *Champlin Refining Co.* v. *Corporation Comm'n of Okla.*, 286 U. S. 210, 234, the "normal rule" is "that partial . . . invalidation is the required course," *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 504. The Board's existence does not violate the separation of powers, but the substantive removal restrictions imposed by §§7211(e)(6) and 7217(d)(3) do. Concluding that the removal restrictions here are invalid leaves the Board removable by the Commission at will. With the tenure restrictions excised, the Act remains " 'fully operative as a law,' " *New York* v. *United States*, 505 U. S. 144, 186, and nothing in the Act's text or historical context makes it "evident" that Congress would have preferred no Board at all to a Board whose members are removable at will, *Alaska Airlines, Inc.* v. *Brock*, 480 U. S. 678, 684. The consequence is that the Board may continue to function as before, but its members may be removed at will by the Commission. Pp. 27–29.

4. The Board's appointment is consistent with the Appointments Clause. Pp. 29–33.

(a) The Board members are inferior officers whose appointment Congress may permissibly vest in a "Hea[d] of Departmen[t]." Inferior officers "are officers whose work is directed and supervised at some level" by superiors appointed by the President with the Senate's consent. *Edmond* v. *United States*, 520 U. S. 651, 662–663. Because the good-cause restrictions discussed above are unconstitutional and void, the Commission possesses the power to remove Board members at will, in addition to its other oversight authority. Board members are therefore directed and supervised by the Commission. Pp. 29–30.

(b) The Commission is a "Departmen[t]" under the Appointments Clause. *Freytag* v. *Commissioner*, 501 U. S. 868, 887, n. 4, specifically reserved the question whether a "principal agenc[y], such as" the SEC, is a "Departmen[t]." The Court now adopts the reasoning of the concurring Justices in *Freytag*, who would have concluded that the SEC is such a "Departmen[t]" because it is a freestanding component of the Executive Branch not subordinate to or contained within any other such component. This reading is consistent with the common, near-contemporary definition of a "department"; with the early practice of Congress, see §3, 1 Stat. 234; and with this Court's cases, which have never invalidated an appointment made by the head of such an establishment. Pp. 30–31.

(c) The several Commissioners, and not the Chairman, are the Commission's "Hea[d]." The Commission's powers are generally vested in the Commissioners jointly, not the Chairman alone. The

                            Syllabus

Commissioners do not report to the Chairman, who exercises admin-
istrative functions subject to the full Commission's policies. There is
no reason why a multimember body may not be the "Hea[d]" of a
"Departmen[t]" that it governs. The Appointments Clause necessar-
ily contemplates collective appointments by the "Courts of Law,"
Art. II, §2, cl. 2, and each House of Congress appoints its officers col-
lectively, see, *e.g.,* Art. I, §2, cl. 5. Practice has also sanctioned the
appointment of inferior officers by multimember agencies. Pp. 31–33.

537 F. 3d 667, affirmed in part, reversed in part, and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA,
KENNEDY, THOMAS, and ALITO, JJ., joined. BREYER, J., filed a dissenting
opinion, in which STEVENS, GINSBURG, and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–861

FREE ENTERPRISE FUND AND BECKSTEAD AND WATTS, LLP, PETITIONERS *v.* PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 28, 2010]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Our Constitution divided the "powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial." *INS* v. *Chadha*, 462 U. S. 919, 951 (1983). Article II vests "[t]he executive Power . . . in a President of the United States of America," who must "take Care that the Laws be faithfully executed." Art. II, §1, cl. 1; *id.,* §3. In light of "[t]he impossibility that one man should be able to perform all the great business of the State," the Constitution provides for executive officers to "assist the supreme Magistrate in discharging the duties of his trust." 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939).

Since 1789, the Constitution has been understood to empower the President to keep these officers accountable—by removing them from office, if necessary. See generally *Myers* v. *United States*, 272 U. S. 52 (1926). This Court has determined, however, that this authority is not without limit. In *Humphrey's Executor* v. *United*

2      FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

*States*, 295 U. S. 602 (1935), we held that Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause.  Likewise, in *United States* v. *Perkins*, 116 U. S. 483 (1886), and *Morrison* v. *Olson*, 487 U. S. 654 (1988), the Court sustained similar restrictions on the power of principal executive officers—themselves responsible to the President—to remove their own inferiors.  The parties do not ask us to reexamine any of these precedents, and we do not do so.

We are asked, however, to consider a new situation not yet encountered by the Court.  The question is whether these separate layers of protection may be combined.  May the President be restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer, even though that inferior officer determines the policy and enforces the laws of the United States?

We hold that such multilevel protection from removal is contrary to Article II's vesting of the executive power in the President.  The President cannot "take Care that the Laws be faithfully executed" if he cannot oversee the faithfulness of the officers who execute them.  Here the President cannot remove an officer who enjoys more than one level of good-cause protection, even if the President determines that the officer is neglecting his duties or discharging them improperly.  That judgment is instead committed to another officer, who may or may not agree with the President's determination, and whom the President cannot remove simply because that officer disagrees with him.  This contravenes the President's "constitutional obligation to ensure the faithful execution of the laws." *Id.,* at 693.

# I
## A

After a series of celebrated accounting debacles, Congress enacted the Sarbanes-Oxley Act of 2002 (or Act), 116 Stat. 745. Among other measures, the Act introduced tighter regulation of the accounting industry under a new Public Company Accounting Oversight Board. The Board is composed of five members, appointed to staggered 5-year terms by the Securities and Exchange Commission. It was modeled on private self-regulatory organizations in the securities industry—such as the New York Stock Exchange—that investigate and discipline their own members subject to Commission oversight. Congress created the Board as a private "nonprofit corporation," and Board members and employees are not considered Government "officer[s] or employee[s]" for statutory purposes. 15 U. S. C. §§7211(a), (b). The Board can thus recruit its members and employees from the private sector by paying salaries far above the standard Government pay scale. See §§7211(f)(4), 7219.[1]

Unlike the self-regulatory organizations, however, the Board is a Government-created, Government-appointed entity, with expansive powers to govern an entire industry. Every accounting firm—both foreign and domestic—that participates in auditing public companies under the securities laws must register with the Board, pay it an annual fee, and comply with its rules and oversight. §§7211(a), 7212(a), (f), 7213, 7216(a)(1). The Board is charged with enforcing the Sarbanes-Oxley Act, the securities laws, the Commission's rules, its own rules, and professional accounting standards. §§7215(b)(1), (c)(4). To this end, the Board may regulate every detail of an accounting firm's practice, including hiring and professional

---

[1] The current salary for the Chairman is $673,000. Other Board members receive $547,000. Brief for Petitioners 3.

4      FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

development, promotion, supervision of audit work, the acceptance of new business and the continuation of old, internal inspection procedures, professional ethics rules, and "such other requirements as the Board may prescribe." §7213(a)(2)(B).

The Board promulgates auditing and ethics standards, performs routine inspections of all accounting firms, demands documents and testimony, and initiates formal investigations and disciplinary proceedings. §§7213–7215 (2006 ed. and Supp. II). The willful violation of any Board rule is treated as a willful violation of the Securities Exchange Act of 1934, 48 Stat. 881, 15 U. S. C. §78a *et seq.*— a federal crime punishable by up to 20 years' imprisonment or $25 million in fines ($5 million for a natural person). §§78ff(a), 7202(b)(1) (2006 ed.). And the Board itself can issue severe sanctions in its disciplinary proceedings, up to and including the permanent revocation of a firm's registration, a permanent ban on a person's associating with any registered firm, and money penalties of $15 million ($750,000 for a natural person). §7215(c)(4). Despite the provisions specifying that Board members are not Government officials for statutory purposes, the parties agree that the Board is "part of the Government" for constitutional purposes, *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 397 (1995), and that its members are "'Officers of the United States'" who "exercis[e] significant authority pursuant to the laws of the United States," *Buckley* v. *Valeo*, 424 U. S. 1, 125–126 (1976) (*per curiam*) (quoting Art. II, §2, cl. 2); cf. Brief for Petitioners 9, n. 1; Brief for United States 29, n. 8.

The Act places the Board under the SEC's oversight, particularly with respect to the issuance of rules or the imposition of sanctions (both of which are subject to Commission approval and alteration). §§7217(b)–(c). But the individual members of the Board—like the officers and directors of the self-regulatory organizations—are sub-

stantially insulated from the Commission's control. The Commission cannot remove Board members at will, but only "for good cause shown," "in accordance with" certain procedures. §7211(e)(6).

Those procedures require a Commission finding, "on the record" and "after notice and opportunity for a hearing," that the Board member

> "(A) has willfully violated any provision of th[e] Act, the rules of the Board, or the securities laws;
> "(B) has willfully abused the authority of that member; or
> "(C) without reasonable justification or excuse, has failed to enforce compliance with any such provision or rule, or any professional standard by any registered public accounting firm or any associated person thereof." §7217(d)(3).

Removal of a Board member requires a formal Commission order and is subject to judicial review. See 5 U. S. C. §§554(a), 556(a), 557(a), (c)(B); 15 U. S. C. §78y(a)(1). Similar procedures govern the Commission's removal of officers and directors of the private self-regulatory organizations. See §78s(h)(4). The parties agree that the Commissioners cannot themselves be removed by the President except under the *Humphrey's Executor* standard of "inefficiency, neglect of duty, or malfeasance in office," 295 U. S., at 620 (internal quotation marks omitted); see Brief for Petitioners 31; Brief for United States 43; Brief for Respondent Public Company Accounting Oversight Board 31 (hereinafter PCAOB Brief); Tr. of Oral Arg. 47, and we decide the case with that understanding.

### B

Beckstead and Watts, LLP, is a Nevada accounting firm registered with the Board. The Board inspected the firm, released a report critical of its auditing procedures, and

6 FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

began a formal investigation. Beckstead and Watts and
the Free Enterprise Fund, a nonprofit organization of
which the firm is a member, then sued the Board and its
members, seeking (among other things) a declaratory
judgment that the Board is unconstitutional and an in-
junction preventing the Board from exercising its powers.
App. 71.

Before the District Court, petitioners argued that the
Sarbanes-Oxley Act contravened the separation of powers
by conferring wide-ranging executive power on Board
members without subjecting them to Presidential control.
*Id.,* at 67–68. Petitioners also challenged the Act under
the Appointments Clause, which requires "Officers of the
United States" to be appointed by the President with the
Senate's advice and consent. Art. II, §2, cl. 2. The Clause
provides an exception for "inferior Officers," whose ap-
pointment Congress may choose to vest "in the President
alone, in the Courts of Law, or in the Heads of Depart-
ments." *Ibid.* Because the Board is appointed by the SEC,
petitioners argued that (1) Board members are not "infe-
rior Officers" who may be appointed by "Heads of Depart-
ments"; (2) even if they are, the Commission is not a "De-
partmen[t]"; and (3) even if it is, the several
Commissioners (as opposed to the Chairman) are not its
"Hea[d]." See App. 68–70. The United States intervened
to defend the Act's constitutionality. Both sides moved for
summary judgment; the District Court determined that it
had jurisdiction and granted summary judgment to re-
spondents. App. to Pet. for Cert. 110a–117a.

A divided Court of Appeals affirmed. 537 F. 3d 667
(CADC 2008). It agreed that the District Court had juris-
diction over petitioners' claims. *Id.,* at 671. On the mer-
its, the Court of Appeals recognized that the removal issue
was "a question of first impression," as neither that court
nor this one "ha[d] considered a situation where a restric-
tion on removal passes through two levels of control." *Id.,*

at 679. It ruled that the dual restraints on Board members' removal are permissible because they do not "render the President unable to perform his constitutional duties." *Id.,* at 683. The majority reasoned that although the President "does not directly select or supervise the Board's members," *id.,* at 681, the Board is subject to the comprehensive control of the Commission, and thus the President's influence over the Commission implies a constitutionally sufficient influence over the Board as well. *Id.,* at 682–683. The majority also held that Board members are inferior officers subject to the Commission's direction and supervision, *id.,* at 672–676, and that their appointment is otherwise consistent with the Appointments Clause, *id.,* at 676–678.

Judge Kavanaugh dissented. He agreed that the case was one of first impression, *id.,* at 698, but argued that "the double for-cause removal provisions in the [Act] . . . combine to eliminate any meaningful Presidential control over the [Board]," *id.,* at 697. Judge Kavanaugh also argued that Board members are not effectively supervised by the Commission and thus cannot be inferior officers under the Appointments Clause. *Id.,* at 709–712.

We granted certiorari. 556 U. S. ___ (2009).

## II

We first consider whether the District Court had jurisdiction. We agree with both courts below that the statutes providing for judicial review of Commission action did not prevent the District Court from considering petitioners' claims.

The Sarbanes-Oxley Act empowers the Commission to review any Board rule or sanction. See 15 U. S. C. §§7217(b)(2)–(4), (c)(2). Once the Commission has acted, aggrieved parties may challenge "a final order of the Commission" or "a rule of the Commission" in a court of appeals under §78y, and "[n]o objection . . . may be consid-

8      FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

ered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so." §§78y(a)(1), (b)(1), (c)(1).

The Government reads §78y as an exclusive route to review. But the text does not expressly limit the jurisdiction that other statutes confer on district courts. See, *e.g.,* 28 U. S. C. §§1331, 2201. Nor does it do so implicitly. Provisions for agency review do not restrict judicial review unless the "statutory scheme" displays a "fairly discernible" intent to limit jurisdiction, and the claims at issue "are of the type Congress intended to be reviewed within th[e] statutory structure." *Thunder Basin Coal Co.* v. *Reich,* 510 U. S. 200, 207, 212 (1994) (internal quotation marks omitted). Generally, when Congress creates procedures "designed to permit agency expertise to be brought to bear on particular problems," those procedures "are to be exclusive." *Whitney Nat. Bank in Jefferson Parish* v. *Bank of New Orleans & Trust Co.,* 379 U. S. 411, 420 (1965). But we presume that Congress does not intend to limit jurisdiction if "a finding of preclusion could foreclose all meaningful judicial review"; if the suit is "wholly collateral to a statute's review provisions"; and if the claims are "outside the agency's expertise." *Thunder Basin, supra,* at 212–213 (internal quotation marks omitted). These considerations point against any limitation on review here.

We do not see how petitioners could meaningfully pursue their constitutional claims under the Government's theory. Section 78y provides only for judicial review of *Commission* action, and not every Board action is encapsulated in a final Commission order or rule.

The Government suggests that petitioners could first have sought Commission review of the Board's "auditing standards, registration requirements, or other rules." Brief for United States 16. But petitioners object to the Board's existence, not to any of its auditing standards.

Petitioners' general challenge to the Board is "collateral" to any Commission orders or rules from which review might be sought. Cf. *McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479, 491–492 (1991). Requiring petitioners to select and challenge a Board rule at random is an odd procedure for Congress to choose, especially because only *new* rules, and not existing ones, are subject to challenge. See 15 U. S. C. §§78s(b)(2), 78y(a)(1), 7217(b)(4).

Alternatively, the Government advises petitioners to raise their claims by appealing a Board sanction. Brief for United States 16–17. But the investigation of Beckstead and Watts produced no sanction, see *id.,* at 7, n. 5; Reply Brief for Petitioners 29, n. 11 (hereinafter Reply Brief), and an uncomplimentary inspection report is not subject to judicial review, see §7214(h)(2). So the Government proposes that Beckstead and Watts *incur* a sanction (such as a sizable fine) by ignoring Board requests for documents and testimony. Brief for United States 17. If the Commission then affirms, the firm will win access to a court of appeals—and severe punishment should its challenge fail. We normally do not require plaintiffs to "bet the farm . . . by taking the violative action" before "testing the validity of the law," *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U. S. 118, 129 (2007); accord, *Ex parte Young*, 209 U. S. 123 (1908), and we do not consider this a "meaningful" avenue of relief. *Thunder Basin*, 510 U. S., at 212.

Petitioners' constitutional claims are also outside the Commission's competence and expertise. In *Thunder Basin*, the petitioner's primary claims were statutory; "at root . . . [they] ar[o]se under the Mine Act and f[e]ll squarely within the [agency's] expertise," given that the agency had "extensive experience" on the issue and had "recently addressed the precise . . . claims presented." *Id.,* at 214–215. Likewise, in *United States* v. *Ruzicka*, 329 U. S. 287 (1946), on which the Government relies, we reserved for the agency fact-bound inquiries that, even if

"formulated in constitutional terms," rested ultimately on "factors that call for [an] understanding of the milk industry," to which the Court made no pretensions. *Id.,* at 294. No similar expertise is required here, and the statutory questions involved do not require "technical considerations of [agency] policy." *Johnson* v. *Robison*, 415 U. S. 361, 373 (1974). They are instead standard questions of administrative law, which the courts are at no disadvantage in answering.

We therefore conclude that §78y did not strip the District Court of jurisdiction over these claims, which are properly presented for our review.[2]

## III

We hold that the dual for-cause limitations on the removal of Board members contravene the Constitution's separation of powers.

## A

The Constitution provides that "[t]he executive Power shall be vested in a President of the United States of

---

[2] The Government asserts that "petitioners have not pointed to any case in which this Court has recognized an implied private right of action directly under the Constitution to challenge governmental action under the Appointments Clause or separation-of-powers principles." Brief for United States 22. The Government does not appear to dispute such a right to relief as a general matter, without regard to the particular constitutional provisions at issue here. See, *e.g., Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 74 (2001) (equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally"); *Bell* v. *Hood*, 327 U. S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"); see also *Ex parte Young*, 209 U. S. 123, 149, 165, 167 (1908). If the Government's point is that an Appointments Clause or separation-of-powers claim should be treated differently than every other constitutional claim, it offers no reason and cites no authority why that might be so.

America." Art. II, §1, cl. 1. As Madison stated on the floor of the First Congress, "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Cong. 463 (1789).

The removal of executive officers was discussed extensively in Congress when the first executive departments were created. The view that "prevailed, as most consonant to the text of the Constitution" and "to the requisite responsibility and harmony in the Executive Department," was that the executive power included a power to oversee executive officers through removal; because that traditional executive power was not "expressly taken away, it remained with the President." Letter from James Madison to Thomas Jefferson (June 30, 1789), 16 Documentary History of the First Federal Congress 893 (2004). "This Decision of 1789 provides contemporaneous and weighty evidence of the Constitution's meaning since many of the Members of the First Congress had taken part in framing that instrument." *Bowsher* v. *Synar*, 478 U. S. 714, 723–724 (1986) (internal quotation marks omitted). And it soon became the "settled and well understood construction of the Constitution." *Ex parte Hennen*, 13 Pet. 230, 259 (1839).

The landmark case of *Myers* v. *United States* reaffirmed the principle that Article II confers on the President "the general administrative control of those executing the laws." 272 U. S., at 164. It is *his* responsibility to take care that the laws be faithfully executed. The buck stops with the President, in Harry Truman's famous phrase. As we explained in *Myers*, the President therefore must have some "power of removing those for whom he can not continue to be responsible." *Id.,* at 117.

Nearly a decade later in *Humphrey's Executor*, this Court held that *Myers* did not prevent Congress from conferring good-cause tenure on the principal officers of

12      FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

certain independent agencies.  That case concerned the members of the Federal Trade Commission, who held 7-year terms and could not be removed by the President except for "'inefficiency, neglect of duty, or malfeasance in office.'"  295 U. S., at 620 (quoting 15 U. S. C. §41).  The Court distinguished *Myers* on the ground that *Myers* concerned "an officer [who] is merely one of the units in the executive department and, hence, inherently subject to the exclusive and illimitable power of removal by the Chief Executive, whose subordinate and aid he is."  295 U. S., at 627.  By contrast, the Court characterized the FTC as "quasi-legislative and quasi-judicial" rather than "purely executive," and held that Congress could require it "to act . . . independently of executive control."  *Id.,* at 627–629.  Because "one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will," the Court held that Congress had power to "fix the period during which [the Commissioners] shall continue in office, and to forbid their removal except for cause in the meantime."  *Id.*, at 629.

*Humphrey's Executor* did not address the removal of inferior officers, whose appointment Congress may vest in heads of departments.  If Congress does so, it is ordinarily the department head, rather than the President, who enjoys the power of removal.  See *Myers*, *supra,* at 119, 127; *Hennen*, *supra,* at 259–260.  This Court has upheld for-cause limitations on that power as well.

In *Perkins*, a naval cadet-engineer was honorably discharged from the Navy because his services were no longer required.  116 U. S. 483.  He brought a claim for his salary under statutes barring his peacetime discharge except by a court-martial or by the Secretary of the Navy "for misconduct."  Rev. Stat. §§1229, 1525.  This Court adopted verbatim the reasoning of the Court of Claims, which had held that when Congress "'vests the appointment of infe-

rior officers in the heads of Departments[,] it may limit and restrict the power of removal as it deems best for the public interest.'" 116 U. S., at 485. Because Perkins had not been "'dismissed for misconduct . . . [or upon] the sentence of a court-martial,'" the Court agreed that he was "'still in office and . . . entitled to [his] pay.'" *Ibid.*[3]

We again considered the status of inferior officers in *Morrison*. That case concerned the Ethics in Government Act, which provided for an independent counsel to investigate allegations of crime by high executive officers. The counsel was appointed by a special court, wielded the full powers of a prosecutor, and was removable by the Attorney General only "'for good cause.'" 487 U. S., at 663 (quoting 28 U. S. C. §596(a)(1)). We recognized that the independent counsel was undoubtedly an executive officer, rather than "'quasi-legislative'" or "'quasi-judicial,'" but we stated as "our present considered view" that Congress had power to impose good-cause restrictions on her removal. 487 U. S., at 689–691. The Court noted that the statute "g[a]ve the Attorney General," an officer directly responsible to the President and "through [whom]" the President could act, "several means of supervising or controlling" the independent counsel—"[m]ost importantly . . . the power to remove the counsel for good cause." *Id.*, at 695–696 (internal quotation marks omitted). Under

——————

[3] When *Perkins* was decided in 1886, the Secretary of the Navy was a principal officer and the head of a department, see Rev. Stat. §415, and the Tenure of Office Act purported to require Senate consent for his removal. Ch. 154, 14 Stat. 430, Rev. Stat. §1767. This requirement was widely regarded as unconstitutional and void (as it is universally regarded today), and it was repealed the next year. See Act of Mar. 3, 1887, ch. 353, 24 Stat. 500; *Myers* v. *United States*, 272 U. S. 52, 167–168 (1926); see also *Bowsher* v. *Synar*, 478 U. S. 714, 726 (1986). *Perkins* cannot be read to endorse any such restriction, much less in combination with *further* restrictions on the removal of inferiors. The Court of Claims opinion adopted verbatim by this Court addressed only the authority of the Secretary of the Navy to remove inferior officers.

14      FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

those circumstances, the Court sustained the statute. *Morrison* did not, however, address the consequences of more than one level of good-cause tenure—leaving the issue, as both the court and dissent below recognized, "a question of first impression" in this Court.  537 F. 3d, at 679; see *id.,* at 698 (dissenting opinion).

B

As explained, we have previously upheld limited restrictions on the President's removal power.  In those cases, however, only one level of protected tenure separated the President from an officer exercising executive power.  It was the President—or a subordinate he could remove at will—who decided whether the officer's conduct merited removal under the good-cause standard.

The Act before us does something quite different.  It not only protects Board members from removal except for good cause, but withdraws from the President any decision on whether that good cause exists.  That decision is vested instead in other tenured officers—the Commissioners— none of whom is subject to the President's direct control. The result is a Board that is not accountable to the President, and a President who is not responsible for the Board.

The added layer of tenure protection makes a difference. Without a layer of insulation between the Commission and the Board, the Commission could remove a Board member at any time, and therefore would be fully responsible for what the Board does.  The President could then hold the Commission to account for its supervision of the Board, to the same extent that he may hold the Commission to account for everything else it does.

A second level of tenure protection changes the nature of the President's review.  Now the Commission cannot remove a Board member at will.  The President therefore cannot hold the Commission fully accountable for the Board's conduct, to the same extent that he may hold the

Commission accountable for everything else that it does. The Commissioners are not responsible for the Board's actions. They are only responsible for their own determination of whether the Act's rigorous good-cause standard is met. And even if the President disagrees with their determination, he is powerless to intervene—unless that determination is so unreasonable as to constitute "inefficiency, neglect of duty, or malfeasance in office." *Humphrey's Executor*, 295 U. S., at 620 (internal quotation marks omitted).

This novel structure does not merely add to the Board's independence, but transforms it. Neither the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over the Board. The President is stripped of the power our precedents have preserved, and his ability to execute the laws—by holding his subordinates accountable for their conduct—is impaired.

That arrangement is contrary to Article II's vesting of the executive power in the President. Without the ability to oversee the Board, or to attribute the Board's failings to those whom he *can* oversee, the President is no longer the judge of the Board's conduct. He is not the one who decides whether Board members are abusing their offices or neglecting their duties. He can neither ensure that the laws are faithfully executed, nor be held responsible for a Board member's breach of faith. This violates the basic principle that the President "cannot delegate ultimate responsibility or the active obligation to supervise that goes with it," because Article II "makes a single President responsible for the actions of the Executive Branch." *Clinton* v. *Jones*, 520 U. S. 681, 712–713 (1997) (BREYER, J., concurring in judgment).[4]

———————

[4] Contrary to the dissent's suggestion, *post,* at 12–14 (opinion of BREYER, J.), the second layer of tenure protection does compromise the

16 FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

Indeed, if allowed to stand, this dispersion of responsibility could be multiplied. If Congress can shelter the bureaucracy behind two layers of good-cause tenure, why not a third? At oral argument, the Government was unwilling to concede that even *five* layers between the President and the Board would be too many. Tr. of Oral Arg. 47–48. The officers of such an agency—safely encased within a Matryoshka doll of tenure protections—would be immune from Presidential oversight, even as they exercised power in the people's name.

Perhaps an individual President might find advantages in tying his own hands. But the separation of powers does not depend on the views of individual Presidents, see *Freytag* v. *Commissioner*, 501 U. S. 868, 879–880 (1991), nor on whether "the encroached-upon branch approves the encroachment," *New York* v. *United States*, 505 U. S. 144, 182 (1992). The President can always choose to restrain himself in his dealings with subordinates. He cannot, however, choose to bind his successors by diminishing their powers, nor can he escape responsibility for his choices by pretending that they are not his own.

The diffusion of power carries with it a diffusion of accountability. The people do not vote for the "Officers of the United States." Art. II, §2, cl. 2. They instead look to the President to guide the "assistants or deputies . . . subject to his superintendence." The Federalist No. 72, p.

––––––––

President's ability to remove a Board member the Commission wants to retain. Without a second layer of protection, the Commission has no excuse for retaining an officer who is not faithfully executing the law. With the second layer in place, the Commission can shield its decision from Presidential review by finding that good cause is absent—a finding that, given the Commission's own protected tenure, the President cannot easily overturn. The dissent describes this conflict merely as one of four possible "scenarios," see *post,* at 12–13, but it is the central issue in this case: The second layer matters precisely when the President finds it necessary to have a subordinate officer removed, and a statute prevents him from doing so.

487 (J. Cooke ed. 1961) (A. Hamilton). Without a clear and effective chain of command, the public cannot "determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." *Id.,* No. 70, at 476 (same). That is why the Framers sought to ensure that "those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." 1 Annals of Cong., at 499 (J. Madison).

By granting the Board executive power without the Executive's oversight, this Act subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts. The Act's restrictions are incompatible with the Constitution's separation of powers.

C

Respondents and the dissent resist this conclusion, portraying the Board as "the kind of practical accommodation between the Legislature and the Executive that should be permitted in a 'workable government.'" *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252, 276 (1991) (*MWAA*) (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (Jackson, J., concurring)); see, *e.g., post,* at 6 (opinion of BREYER, J.). According to the dissent, Congress may impose multiple levels of for-cause tenure between the President and his subordinates when it "rests agency independence upon the need for technical expertise." *Post*, at 18. The Board's mission is said to demand both "technical competence" and "apolitical expertise," and its powers may only be exercised by "technical professional experts." *Post,* at 18 (internal quotation marks omitted). In this respect the statute creating the

18      FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

Board is, we are told, simply one example of the "vast numbers of statutes governing vast numbers of subjects, concerned with vast numbers of different problems, [that] provide for, or foresee, their execution or administration through the work of administrators organized within many different kinds of administrative structures, exercising different kinds of administrative authority, to achieve their legislatively mandated objectives." *Post,* at 8.

No one doubts Congress's power to create a vast and varied federal bureaucracy. But where, in all this, is the role for oversight by an elected President? The Constitution requires that a President chosen by the entire Nation oversee the execution of the laws. And the "'fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution,'" for "'[c]onvenience and efficiency are not the primary objectives—or the hallmarks—of democratic government.'" *Bowsher*, 478 U. S., at 736 (quoting *Chadha*, 462 U. S., at 944).

One can have a government that functions without being ruled by functionaries, and a government that benefits from expertise without being ruled by experts. Our Constitution was adopted to enable the people to govern themselves, through their elected leaders. The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may slip from the Executive's control, and thus from that of the people. This concern is largely absent from the dissent's paean to the administrative state.

For example, the dissent dismisses the importance of removal as a tool of supervision, concluding that the President's "power to get something done" more often depends on "who controls the agency's budget requests and funding, the relationships between one agency or department and another, . . . purely political factors (including Con-

gress' ability to assert influence)," and indeed whether particular *unelected* officials support or "resist" the President's policies. *Post,* at 11, 13 (emphasis deleted). The Framers did not rest our liberties on such bureaucratic minutiae. As we said in *Bowsher, supra,* at 730, "[t]he separated powers of our Government cannot be permitted to turn on judicial assessment of whether an officer exercising executive power is on good terms with Congress."

In fact, the multilevel protection that the dissent endorses "provides a blueprint for extensive expansion of the legislative power." *MWAA, supra,* at 277. In a system of checks and balances, "[p]ower abhors a vacuum," and one branch's handicap is another's strength. 537 F. 3d, at 695, n. 4 (Kavanaugh, J., dissenting) (internal quotation marks omitted). "Even when a branch does not arrogate power to itself," therefore, it must not "impair another in the performance of its constitutional duties." *Loving* v. *United States*, 517 U. S. 748, 757 (1996).[5] Congress has plenary control over the salary, duties, and even existence of executive offices. Only Presidential oversight can counter its influence. That is why the Constitution vests certain powers in the President that "the Legislature has no right to diminish or modify." 1 Annals of Cong., at 463 (J. Madison).[6]

---

[5] The dissent quotes *Buckley* v. *Valeo*, 424 U. S. 1, 138 (1976) (*per curiam*), for the proposition that Congress has "broad authority to 'create' governmental '"offices"' and to structure those offices 'as it chooses.'" *Post,* at 2. The *Buckley* Court put "'offices'" in quotes because it was actually describing legislative positions that are not really offices at all (at least not under Article II). That is why the very next sentence of *Buckley* said, "*But* Congress' power . . . is inevitably bounded by the express language" of the Constitution. 424 U. S., at 138–139 (emphasis added).

[6] The dissent attributes to Madison a belief that some executive officers, such as the Comptroller, could be made independent of the President. See *post,* at 17–18. But Madison's actual proposal, consistent with his view of the Constitution, was that the Comptroller hold office

The Framers created a structure in which "[a] depend-
ence on the people" would be the "primary controul on the
government." The Federalist No. 51, at 349 (J. Madison).
That dependence is maintained, not just by "parchment
barriers," *id.,* No. 48, at 333 (same), but by letting
"[a]mbition . . . counteract ambition," giving each branch
"the necessary constitutional means, and personal mo-
tives, to resist encroachments of the others," *id.,* No. 51, at
349. A key "constitutional means" vested in the Presi-
dent—perhaps *the* key means—was "the power of appoint-
ing, overseeing, and controlling those who execute the
laws." 1 Annals of Cong., at 463. And while a government
of "opposite and rival interests" may sometimes inhibit the
smooth functioning of administration, The Federalist No.
51, at 349, "[t]he Framers recognized that, in the long
term, structural protections against abuse of power were
critical to preserving liberty." *Bowsher*, *supra,* at 730.

Calls to abandon those protections in light of "the era's
perceived necessity," *New York*, 505 U. S., at 187, are not
unusual. Nor is the argument from bureaucratic expertise
limited only to the field of accounting. The failures of
accounting regulation may be a "pressing national prob-
lem," but "a judiciary that licensed extraconstitutional
government with each issue of comparable gravity would,
in the long run, be far worse." *Id.,* at 187–188. Neither
respondents nor the dissent explains why the Board's
task, unlike so many others, requires *more* than one layer
of insulation from the President—or, for that matter, why
only two. The point is not to take issue with for-cause
limitations in general; we do not do that. The question
here is far more modest. We deal with the unusual situa-

––––––––––

for a term of "years, unless sooner removed by the President"; he would
thus be "dependent upon the President, because he can be removed by
him," and also "dependent upon the Senate, because they must consent
to his [reappointment] for every term of years." 1 Annals of Cong. 612
(1789).

tion, never before addressed by the Court, of two layers of for-cause tenure. And though it may be criticized as "elementary arithmetical logic," *post,* at 23, two layers are not the same as one.

The President has been given the power to oversee executive officers; he is not limited, as in Harry Truman's lament, to "persuad[ing]" his unelected subordinates "to do what they ought to do without persuasion." *Post,* at 11 (internal quotation marks omitted). In its pursuit of a "workable government," Congress cannot reduce the Chief Magistrate to a cajoler-in-chief.

### D

The United States concedes that some constraints on the removal of inferior executive officers might violate the Constitution. See Brief for United States 47. It contends, however, that the removal restrictions at issue here do not.

To begin with, the Government argues that the Commission's removal power over the Board is "broad," and could be construed as broader still, if necessary to avoid invalidation. See, *e.g., id.,* at 51, and n. 19; cf. PCAOB Brief 22–23. But the Government does not contend that simple disagreement with the Board's policies or priorities could constitute "good cause" for its removal. See Tr. of Oral Arg. 41–43, 45–46. Nor do our precedents suggest as much. *Humphrey's Executor*, for example, rejected a removal premised on a lack of agreement "'on either the policies or the administering of the Federal Trade Commission,'" because the FTC was designed to be "'independent in character,'" "free from 'political domination or control,'" and not "'subject to anybody in the government'" or "'to the orders of the President.'" 295 U. S., at 619, 625. Accord, *Morrison*, 487 U. S., at 693 (noting that "the congressional determination to limit the removal power of the Attorney General was essential . . . to establish the neces-

22      FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

sary independence of the office"); *Wiener* v. *United States*, 357 U. S. 349, 356 (1958) (describing for-cause removal as "involving the rectitude" of an officer). And here there is judicial review of any effort to remove Board members, see 15 U. S. C. §78y(a)(1), so the Commission will not have the final word on the propriety of its own removal orders. The removal restrictions set forth in the statute mean what they say.

Indeed, this case presents an even more serious threat to executive control than an "ordinary" dual for-cause standard. Congress enacted an unusually high standard that must be met before Board members may be removed. A Board member cannot be removed except for willful violations of the Act, Board rules, or the securities laws; willful abuse of authority; or unreasonable failure to enforce compliance—as determined in a formal Commission order, rendered on the record and after notice and an opportunity for a hearing. §7217(d)(3); see §78y(a). The Act does not even give the Commission power to fire Board members for violations of *other* laws that do not relate to the Act, the securities laws, or the Board's authority. The President might have less than full confidence in, say, a Board member who cheats on his taxes; but that discovery is not listed among the grounds for removal under §7217(d)(3).[7]

The rigorous standard that must be met before a Board member may be removed was drawn from statutes con-

―――――――

[7] The Government implausibly argues that §7217(d)(3) "does not expressly make its three specified grounds of removal exclusive," and that "the Act could be construed to permit other grounds." Brief for United States 51, n. 19. But having provided in §7211(e)(6) that Board members are to be removed "in accordance with [§7217(d)(3)], for good cause shown," Congress would not have specified the necessary Commission finding in §7217(d)(3)—including formal procedures and detailed conditions—if Board members could also be removed without any finding at all. Cf. PCAOB Brief 6 ("Cause exists where" the §7217(d)(3) conditions are met).

cerning private organizations like the New York Stock Exchange. Cf. §§78s(h)(4), 7217(d)(3). While we need not decide the question here, a removal standard appropriate for limiting Government control over private bodies may be inappropriate for officers wielding the executive power of the United States.

Alternatively, respondents portray the Act's limitations on removal as irrelevant, because—as the Court of Appeals held—the Commission wields "at-will removal power over Board *functions* if not Board members." 537 F. 3d, at 683 (emphasis added); accord, Brief for United States 27–28; PCAOB Brief 48. The Commission's general "oversight and enforcement authority over the Board," §7217(a), is said to "blun[t] the constitutional impact of for-cause removal," 537 F. 3d, at 683, and to leave the President no worse off than "if Congress had lodged the Board's functions in the SEC's own staff," PCAOB Brief 15.

Broad power over Board functions is not equivalent to the power to remove Board members. The Commission may, for example, approve the Board's budget, §7219(b), issue binding regulations, §§7202(a), 7217(b)(5), relieve the Board of authority, §7217(d)(1), amend Board sanctions, §7217(c), or enforce Board rules on its own, §§7202(b)(1), (c). But altering the budget or powers of an agency as a whole is a problematic way to control an inferior officer. The Commission cannot wield a free hand to supervise individual members if it must destroy the Board in order to fix it.

Even if Commission power over Board activities could substitute for authority over its members, we would still reject respondents' premise that the Commission's power in this regard is plenary. As described above, the Board is empowered to take significant enforcement actions, and does so largely independently of the Commission. See *supra,* at 3–4. Its powers are, of course, subject to some latent Commission control. See *supra,* at 4–5. But the Act

24    FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

nowhere gives the Commission effective power to start, stop, or alter individual Board investigations, executive activities typically carried out by officials within the Executive Branch.

The Government and the dissent suggest that the Commission could govern and direct the Board's daily exercise of prosecutorial discretion by promulgating new SEC rules, or by amending those of the Board. Brief for United States 27; *post,* at 15. Enacting general rules through the required notice and comment procedures is obviously a poor means of micromanaging the Board's affairs. See §§78s(c), 7215(b)(1), 7217(b)(5); cf. 5 U. S. C. §553, 15 U. S. C. §7202(a), PCAOB Brief 24, n. 6.[8] So the Government offers another proposal, that the Commission require the Board by rule to "secure SEC approval for any actions that it now may take itself." Brief for United States 27. That would surely constitute one of the "limitations upon the activities, functions, and operations of the Board" that the Act forbids, at least without Commission findings equivalent to those required to fire the Board instead. §7217(d)(2). The Board thus has significant independence in determining its priorities and intervening in the affairs of regulated firms (and the lives of their associated persons) without Commission preapproval or direction.

Finally, respondents suggest that our conclusion is contradicted by the past practice of Congress. But the Sarbanes-Oxley Act is highly unusual in committing substantial executive authority to officers protected by two layers of for-cause removal—including at one level a sharply circumscribed definition of what constitutes "good

---

[8] Contrary to the dissent's assertions, see *post,* at 15–16, the Commission's powers to conduct its own investigations (with its own resources), to remove particular provisions of law from the Board's bailiwick, or to require the Board to perform functions "other" than inspections and investigations, §7211(c)(5), are no more useful in directing individual enforcement actions.

cause," and rigorous procedures that must be followed prior to removal.

The parties have identified only a handful of isolated positions in which inferior officers might be protected by two levels of good-cause tenure. See, *e.g.,* PCAOB Brief 43. As Judge Kavanaugh noted in dissent below:

> "Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity. Neither the majority opinion nor the PCAOB nor the United States as intervenor has located any historical analogues for this novel structure. They have not identified any independent agency other than the PCAOB that is appointed by and removable only for cause by another independent agency." 537 F. 3d, at 669.

The dissent here suggests that other such positions might exist, and complains that we do not resolve their status in this opinion. *Post,* at 23–31. The dissent itself, however, stresses the very size and variety of the Federal Government, see *post,* at 7–8, and those features discourage general pronouncements on matters neither briefed nor argued here. In any event, the dissent fails to support its premonitions of doom; none of the positions it identifies are similarly situated to the Board. See *post,* at 28–31.

For example, many civil servants within independent agencies would not qualify as "Officers of the United States," who "exercis[e] significant authority pursuant to the laws of the United States," *Buckley*, 424 U. S., at 126.[9] The parties here concede that Board members are executive "Officers," as that term is used in the Constitution.

---

[9] One "may be an agent or employé working for the government and paid by it, as nine-tenths of the persons rendering service to the government undoubtedly are, without thereby becoming its office[r]." *United States* v. *Germaine*, 99 U. S. 508, 509 (1879). The applicable proportion has of course increased dramatically since 1879.

See *supra,* at 4; see also Art. II, §2, cl. 2. We do not decide the status of other Government employees, nor do we decide whether "lesser functionaries subordinate to officers of the United States" must be subject to the same sort of control as those who exercise "significant authority pursuant to the laws." *Buckley*, *supra,* at 126, and n. 162.

Nor do the employees referenced by the dissent enjoy the same significant and unusual protections from Presidential oversight as members of the Board. Senior or policymaking positions in government may be excepted from the competitive service to ensure Presidential control, see 5 U. S. C. §§2302(a)(2)(B), 3302, 7511(b)(2), and members of the Senior Executive Service may be reassigned or reviewed by agency heads (and entire agencies may be excluded from that Service by the President), see, *e.g.,* §§3132(c), 3395(a), 4312(d), 4314(b)(3), (c)(3); cf. §2302(a)(2)(B)(ii). While the full extent of that authority is not before us, any such authority is of course wholly absent with respect to the Board. Nothing in our opinion, therefore, should be read to cast doubt on the use of what is colloquially known as the civil service system within independent agencies.[10]

Finally, the dissent wanders far afield when it suggests that today's opinion might increase the President's author-

_____

[10] For similar reasons, our holding also does not address that subset of independent agency employees who serve as administrative law judges. See, *e.g.,* 5 U. S. C. §§556(c), 3105. Whether administrative law judges are necessarily "Officers of the United States" is disputed. See, *e.g., Landry* v. *FDIC*, 204 F. 3d 1125 (CADC 2000). And unlike members of the Board, many administrative law judges of course perform adjudicative rather than enforcement or policymaking functions, see §§554(d), 3105, or possess purely recommendatory powers. The Government below refused to identify either "civil service tenure-protected employees in independent agencies" or administrative law judges as "precedent for the PCAOB." 537 F. 3d 667, 699, n. 8 (CADC 2008) (Kavanaugh, J., dissenting); see Tr. of Oral Arg. in No. 07–5127 (CADC), pp. 32, 37–38, 42.

ity to remove military officers. Without expressing any view whatever on the scope of that authority, it is enough to note that we see little analogy between our Nation's armed services and the Public Company Accounting Oversight Board. Military officers are broadly subject to Presidential control through the chain of command and through the President's powers as Commander in Chief. Art. II, §2, cl. 1; see, *e.g.,* 10 U. S. C. §§162, 164(g). The President and his subordinates may also convene boards of inquiry or courts-martial to hear claims of misconduct or poor performance by those officers. See, *e.g.,* §§822(a)(1), 823(a)(1), 892(3), 933–934, 1181–1185. Here, by contrast, the President has no authority to initiate a Board member's removal for cause.

There is no reason for us to address whether these positions identified by the dissent, or any others not at issue in this case, are so structured as to infringe the President's constitutional authority. Nor is there any substance to the dissent's concern that the "work of all these various officials" will "be put on hold." *Post,* at 31. As the judgment in this case demonstrates, restricting certain officers to a single level of insulation from the President affects the conditions under which those officers might some day be removed, and would have no effect, absent a congressional determination to the contrary, on the validity of any officer's continuance in office. The only issue in this case is whether Congress may deprive the President of adequate control over the Board, which is the regulator of first resort and the primary law enforcement authority for a vital sector of our economy. We hold that it cannot.

## IV

Petitioners' complaint argued that the Board's "freedom from Presidential oversight and control" rendered it "and all power and authority exercised by it" in violation of the

28    FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

Constitution. App. 46. We reject such a broad holding. Instead, we agree with the Government that the unconstitutional tenure provisions are severable from the remainder of the statute.

"Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem," severing any "problematic portions while leaving the remainder intact." *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 328–329 (2006). Because "[t]he unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions," *Champlin Refining Co.* v. *Corporation Comm'n of Okla.*, 286 U. S. 210, 234 (1932), the "normal rule" is "that partial, rather than facial, invalidation is the required course," *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 504 (1985). Putting to one side petitioners' Appointments Clause challenges (addressed below), the existence of the Board does not violate the separation of powers, but the substantive removal restrictions imposed by §§7211(e)(6) and 7217(d)(3) do. Under the traditional default rule, removal is incident to the power of appointment. See, *e.g., Sampson* v. *Murray*, 415 U. S. 61, 70, n. 17 (1974); *Myers*, 272 U. S., at 119; *Ex parte Hennen*, 13 Pet., at 259–260. Concluding that the removal restrictions are invalid leaves the Board removable by the Commission at will, and leaves the President separated from Board members by only a single level of good-cause tenure. The Commission is then fully responsible for the Board's actions, which are no less subject than the Commission's own functions to Presidential oversight.

The Sarbanes-Oxley Act remains "'fully operative as a law'" with these tenure restrictions excised. *New York*, 505 U. S., at 186 (quoting *Alaska Airlines, Inc.* v. *Brock*, 480 U. S. 678, 684 (1987)). We therefore must sustain its remaining provisions "[u]nless it is evident that the Legislature would not have enacted those provisions . . . inde-

pendently of that which is [invalid]." *Ibid.* (internal quotation marks omitted). Though this inquiry can sometimes be "elusive," *Chadha*, 462 U. S., at 932, the answer here seems clear: The remaining provisions are not "incapable of functioning independently," *Alaska Airlines*, 480 U. S., at 684, and nothing in the statute's text or historical context makes it "evident" that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board whose members are removable at will. *Ibid.*; see also *Ayotte*, *supra,* at 330.

It is true that the language providing for good-cause removal is only one of a number of statutory provisions that, working together, produce a constitutional violation. In theory, perhaps, the Court might blue-pencil a sufficient number of the Board's responsibilities so that its members would no longer be "Officers of the United States." Or we could restrict the Board's enforcement powers, so that it would be a purely recommendatory panel. Or the Board members could in future be made removable by the President, for good cause or at will. But such editorial freedom—far more extensive than our holding today—belongs to the Legislature, not the Judiciary. Congress of course remains free to pursue any of these options going forward.

## V

Petitioners raise three more challenges to the Board under the Appointments Clause. None has merit.

First, petitioners argue that Board members are principal officers requiring Presidential appointment with the Senate's advice and consent. We held in *Edmond* v. *United States*, 520 U. S. 651, 662–663 (1997), that "[w]hether one is an 'inferior' officer depends on whether he has a superior," and that "'inferior officers' are officers whose work is directed and supervised at some level" by other officers appointed by the President with the Senate's

30      FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

consent.    In particular, we noted that "[t]he power to remove officers" at will and without cause "is a powerful tool for control" of an inferior.  *Id.,* at 664.  As explained above, the statutory restrictions on the Commission's power to remove Board members are unconstitutional and void.    Given that the Commission is properly viewed, under the Constitution, as possessing the power to remove Board members at will, and given the Commission's other oversight authority, we have no hesitation in concluding that under *Edmond* the Board members are inferior officers whose appointment Congress may permissibly vest in a "Hea[d] of Departmen[t]."

But, petitioners argue, the Commission is not a "Departmen[t]" like the "Executive departments" (*e.g.,* State, Treasury, Defense) listed in 5 U. S. C. §101.  In *Freytag*, 501 U. S., at 887, n. 4, we specifically reserved the question whether a "principal agenc[y], such as . . . the Securities and Exchange Commission," is a "Departmen[t]" under the Appointments Clause.  Four Justices, however, would have concluded that the Commission is indeed such a "Departmen[t]," see *id.,* at 918 (SCALIA, J., concurring in part and concurring in judgment), because it is a "freestanding, self-contained entity in the Executive Branch," *id.,* at 915.

Respondents urge us to adopt this reasoning as to those entities not addressed by our opinion in *Freytag*, see Brief for United States 37–39; PCAOB Brief 30–33, and we do.  Respondents' reading of the Appointments Clause is consistent with the common, near-contemporary definition of a "department" as a "separate allotment or part of business; a distinct province, in which a class of duties are allotted to a particular person."  1 N. Webster, American Dictionary of the English Language (1828) (def. 2) (1995 facsimile ed.).  It is also consistent with the early practice of Congress, which in 1792 authorized the Postmaster General to appoint "an assistant, and deputy postmasters,

at all places where such shall be found necessary," §3, 1 Stat. 234—thus treating him as the "Hea[d] of [a] Departmen[t]" without the title of Secretary or any role in the President's Cabinet. And it is consistent with our prior cases, which have never invalidated an appointment made by the head of such an establishment. See *Freytag*, *supra*, at 917; cf. *Burnap* v. *United States*, 252 U. S. 512, 515 (1920); *United States* v. *Germaine*, 99 U. S. 508, 511 (1879). Because the Commission is a freestanding component of the Executive Branch, not subordinate to or contained within any other such component, it constitutes a "Departmen[t]" for the purposes of the Appointments Clause.[11]

But petitioners are not done yet. They argue that the full Commission cannot constitutionally appoint Board members, because only the Chairman of the Commission is the Commission's "Hea[d]."[12] The Commission's powers, however, are generally vested in the Commissioners jointly, not the Chairman alone. See, *e.g.,* 15 U. S. C. §§77s, 77t, 78u, 78w. The Commissioners do not report to the Chairman, who exercises administrative and executive functions subject to the full Commission's policies. See

––––––––––

[11] We express no view on whether the Commission is thus an "executive Departmen[t]" under the Opinions Clause, Art. II, §2, cl. 1, or under Section 4 of the Twenty-Fifth Amendment. See *Freytag* v. *Commissioner*, 501 U. S. 868, 886–887 (1991).

[12] The Board argued below that petitioners lack standing to raise this claim, because no member of the Board has been appointed over the Chairman's objection, and so petitioners' injuries are not fairly traceable to an invalid appointment. See Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss the Complaint in Civil Action No. 1:06–cv–00217–JR (DC), Doc. 17, pp. 42–43; Brief for Appellees PCAOB et al. in No. 07–5127 (CADC), pp. 32–33. We cannot assume, however, that the Chairman would have made the same appointments acting alone; and petitioners' standing does not require precise proof of what the Board's policies might have been in that counterfactual world. See *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 533 (1962) (plurality opinion).

32    FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

Reorg. Plan No. 10 of 1950, §1(b)(1), 64 Stat. 1265.  The
Chairman is also appointed from among the Commission-
ers by the President alone, *id.,* §3, at 1266, which means
that he cannot be regarded as "the head of an agency" for
purposes of the Reorganization Act.  See 5 U. S. C. §904.
(The Commission as a whole, on the other hand, does meet
the requirements of the Act, including its provision that
"the head of an agency [may] be an individual or a com-
mission or board with more than one member.")[13]

As a constitutional matter, we see no reason why a
multimember body may not be the "Hea[d]" of a "Depart-
men[t]" that it governs.  The Appointments Clause neces-
sarily contemplates collective appointments by the "Courts
of Law," Art. II, §2, cl. 2, and each House of Congress, too,
appoints its officers collectively, see Art. I, §2, cl. 5; *id.,* §3,
cl. 5.  Petitioners argue that the Framers vested the nomi-
nation of principal officers in the President to avoid the
perceived evils of collective appointments, but they reveal
no similar concern with respect to inferior officers, whose
appointments may be vested elsewhere, including in mul-
timember bodies.  Practice has also sanctioned the ap-
pointment of inferior officers by multimember agencies.
See *Freytag*, *supra,* at 918 (SCALIA, J., concurring in part
and concurring in judgment); see also Classification Act of
1923, ch. 265, §2, 42 Stat. 1488 (defining "the head of the
department" to mean "the officer *or group of officers . . .*

———————

[13] Petitioners contend that finding the Commission to be the head will
invalidate numerous appointments made directly by the Chairman,
such as those of the "heads of major [SEC] administrative units."
Reorg. Plan No. 10, §1(b)(2), at 1266.  Assuming, however, that these
individuals are officers of the United States, their appointment is still
made "subject to the approval of the Commission." *Ibid.*  We have
previously found that the department head's approval satisfies the
Appointments Clause, in precedents that petitioners do not ask us to
revisit.  See, *e.g., United States* v. *Smith*, 124 U. S. 525, 532 (1888);
*Germaine*, 99 U. S., at 511; *United States* v. *Hartwell*, 6 Wall. 385, 393–
394 (1868).

who are not subordinate or responsible to any other officer of the department" (emphasis added)); 37 Op. Atty. Gen. 227, 231 (1933) (endorsing collective appointment by the Civil Service Commission). We conclude that the Board members have been validly appointed by the full Commission.

In light of the foregoing, petitioners are not entitled to broad injunctive relief against the Board's continued operations. But they are entitled to declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive. See *Bowsher*, 478 U. S., at 727, n. 5 (concluding that a separation of powers violation may create a "here-and-now" injury that can be remedied by a court (internal quotation marks omitted)).

*    *    *

The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so. That power includes, as a general matter, the authority to remove those who assist him in carrying out his duties. Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else. Such diffusion of authority "would greatly diminish the intended and necessary responsibility of the chief magistrate himself." The Federalist No. 70, at 478.

While we have sustained in certain cases limits on the President's removal power, the Act before us imposes a new type of restriction—two levels of protection from removal for those who nonetheless exercise significant executive power. Congress cannot limit the President's authority in this way.

The judgment of the United States Court of Appeals for the District of Columbia Circuit is affirmed in part and

34	FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Opinion of the Court

reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 08–861

FREE ENTERPRISE FUND AND BECKSTEAD AND WATTS, LLP, PETITIONERS *v.* PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 28, 2010]

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE SOTOMAYOR join, dissenting.

The Court holds unconstitutional a statute providing that the Securities and Exchange Commission can remove members of the Public Company Accounting Oversight Board from office only for cause. It argues that granting the "inferior officer[s]" on the Accounting Board "more than one level of good-cause protection . . . contravenes the President's 'constitutional obligation to ensure the faithful execution of the laws.'" *Ante*, at 2. I agree that the Accounting Board members are inferior officers. See *ante,* at 28–29. But in my view the statute does not significantly interfere with the President's "executive Power." Art. II, §1. It violates no separation-of-powers principle. And the Court's contrary holding threatens to disrupt severely the fair and efficient administration of the laws. I consequently dissent.

## I
### A

The legal question before us arises at the intersection of two general constitutional principles. On the one hand, Congress has broad power to enact statutes "necessary and proper" to the exercise of its specifically enumerated

constitutional authority.  Art. I, §8, cl. 18.  As Chief Justice Marshall wrote for the Court nearly 200 years ago, the Necessary and Proper Clause reflects the Framers' efforts to create a Constitution that would "endure for ages to come." *McCulloch* v. *Maryland*, 4 Wheat. 316, 415 (1819). It embodies their recognition that it would be "unwise" to prescribe "the means by which government should, in all future time, execute its powers." *Ibid.*  Such "immutable rules" would deprive the Government of the needed flexibility to respond to future "exigencies which, if foreseen at all, must have been seen dimly." *Ibid.*  Thus the Necessary and Proper Clause affords Congress broad authority to "create" governmental "'offices'" and to structure those offices "as it chooses." *Buckley* v. *Valeo*, 424 U. S. 1, 138 (1976) *(per curiam);* cf. *Lottery Case*, 188 U. S. 321, 355 (1903).  And Congress has drawn on that power over the past century to create numerous federal agencies in response to "various crises of human affairs" as they have arisen. *McCulloch, supra,* at 415 (emphasis deleted).  Cf. *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, 36–37 (1950).

On the other hand, the opening sections of Articles I, II, and III of the Constitution separately and respectively vest "all legislative Powers" in Congress, the "executive Power" in the President, and the "judicial Power" in the Supreme Court (and such "inferior Courts as Congress may from time to time ordain and establish").  In doing so, these provisions imply a structural separation-of-powers principle.  See, *e.g.*, *Miller* v. *French*, 530 U. S. 327, 341–342 (2000).  And that principle, along with the instruction in Article II, §3 that the President "shall take Care that the Laws be faithfully executed," limits Congress' power to structure the Federal Government.  See, *e.g., INS* v. *Chadha*, 462 U. S. 919, 946 (1983); *Freytag* v. *Commissioner*, 501 U. S. 868, 878 (1991); *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 64 (1982); *Commodity Futures Trading Comm'n* v. *Schor*, 478

U. S. 833, 859–860 (1986). Indeed, this Court has held that the separation-of-powers principle guarantees the President the authority to dismiss certain Executive Branch officials at will. *Myers* v. *United States*, 272 U. S. 52 (1926).

But neither of these two principles is absolute in its application to removal cases. The Necessary and Proper Clause does not grant Congress power to free *all* Executive Branch officials from dismissal at the will of the President. *Ibid.* Nor does the separation-of-powers principle grant the President an absolute authority to remove *any and all* Executive Branch officials at will. Rather, depending on, say, the nature of the office, its function, or its subject matter, Congress sometimes may, consistent with the Constitution, limit the President's authority to remove an officer from his post. See *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935), overruling in part *Myers, supra*; *Morrison* v. *Olson*, 487 U. S. 654 (1988). And we must here decide whether the circumstances surrounding the statute at issue justify such a limitation.

In answering the question presented, we cannot look to more specific constitutional text, such as the text of the Appointments Clause or the Presentment Clause, upon which the Court has relied in other separation-of-powers cases. See, *e.g., Chadha, supra,* at 946; *Buckley, supra,* at 124–125. That is because, with the exception of the general "vesting" and "take care" language, the Constitution is completely "silent with respect to the power of removal from office." *Ex parte Hennen*, 13 Pet. 230, 258 (1839); see also *Morrison*, *supra,* at 723 (SCALIA, J., dissenting) ("There is, of course, no provision in the Constitution stating who may remove executive officers . . . ").

Nor does history offer significant help. The President's power to remove Executive Branch officers "was not discussed in the Constitutional Convention." *Myers, supra,* at 109–110. The First Congress enacted federal statutes

that limited the President's ability to *oversee* Executive
Branch officials, including the Comptroller of the United
States, federal district attorneys (precursors to today's
United States Attorneys), and, to a lesser extent, the
Secretary of the Treasury. See, *e.g.,* Lessig, Readings By
Our Unitary Executive, 15 Cardozo L. Rev. 175, 183–184
(1993); Teifer, The Constitutionality of Independent Offi-
cers as Checks on Abuses of Executive Power, 63 B. U. L.
Rev. 59, 74–75 (1983); Casper, An Essay in Separation of
Powers: Some Early Versions and Practices, 30 Wm. &
Mary L. Rev. 211, 240–241 (1989) (hereinafter Casper); H.
Bruff, Balance of Forces: Separation of Powers in the
Administrative State 414–417 (2006). But those statutes
did not directly limit the President's authority to *remove*
any of those officials—"a subject" that was "much dis-
puted" during "the early history of this government," "and
upon which a great diversity of opinion was entertained."
*Hennen, supra,* at 259; see also *United States ex rel. Good-
rich* v. *Guthrie,* 17 How. 284, 306 (1855) (McLean, J.,
dissenting); Casper 233–237 (recounting the Debate of
1789). Scholars, like Members of this Court, have contin-
ued to disagree, not only about the inferences that should
be drawn from the inconclusive historical record, but also
about the nature of the original disagreement. Compare
*ante,* at 11; *Myers, supra,* at 114 (majority opinion of Taft,
C. J.); and Prakash, New Light on the Decision of 1789, 91
Cornell L. Rev. 1021 (2006), with, *e.g., Myers, supra,* at
194 (McReynolds, J., dissenting); Corwin, Tenure of Office
and the Removal Power Under the Constitution, 27 Colum.
L. Rev. 353, 369 (1927); Lessig & Sunstein, The President
and the Administration, 94 Colum. L. Rev. 1, 25–26 (1994)
(hereinafter Lessig & Sunstein); and L. Fisher, President
and Congress: Power and Policy 86–89 (1972).

Nor does this Court's precedent fully answer the ques-
tion presented. At least it does not clearly invalidate the
provision in dispute. See Part II–C, *infra.* In *Myers,*

*supra,* the Court invalidated—for the first and only time— a congressional statute on the ground that it unduly limited the President's authority to remove an Executive Branch official. But soon thereafter the Court expressly disapproved most of *Myers'* broad reasoning. See *Humphrey's Executor*, 295 U. S., at 626–627, overruling in part *Myers, supra*; *Wiener* v. *United States*, 357 U. S. 349, 352 (1958) (stating that *Humphrey's Executor* "explicitly 'disapproved'" of much of the reasoning in *Myers*). Moreover, the Court has since said that "the essence of the decision in *Myers* was the judgment that the Constitution prevents Congress from *'draw[ing] to itself* . . . the power to remove or the right to participate in the exercise of that power.'" *Morrison, supra,* at 686 (emphasis added). And that feature of the statute—a feature that would *aggrandize* the power of Congress—is not present here. Congress has not granted itself any role in removing the members of the Accounting Board. Cf. *Freytag,* 501 U. S., at 878 ("separation-of-powers jurisprudence generally focuses on the danger of one branch's *aggrandizing its power* at the expense of another branch" (emphasis added)); *Buckley,* 424 U. S., at 129 (same); *Schor,* 478 U. S., at 856 (same); *Bowsher* v. *Synar*, 478 U. S. 714, 727 (1986) (same). Compare *Myers, supra,* (striking down statute where Congress granted *itself* removal authority over Executive Branch official), with *Humphrey's Executor, supra,* (upholding statute where such aggrandizing was absent)*; Wiener, supra* (same)*; Morrison, supra* (same).

In short, the question presented lies at the intersection of two sets of conflicting, broadly framed constitutional principles. And no text, no history, perhaps no precedent provides any clear answer. Cf. *Chicago* v. *Morales*, 527 U. S. 41, 106 (1999) (THOMAS, J., joined by Rehnquist, C. J., and SCALIA, J., dissenting) (expressing the view that "this Court" is "most vulnerable" when "it deals with judge-made constitutional law" that lacks "roots in the

language" of the Constitution (internal quotation marks
omitted)).

## B

When previously deciding this kind of nontextual ques-
tion, the Court has emphasized the importance of examin-
ing how a particular provision, taken in context, is likely
to function. Thus, in *Crowell* v. *Benson,* 285 U. S. 22, 53
(1932), a foundational separation-of-powers case, the
Court said that "regard must be had, as in other cases
where constitutional limits are invoked, not to mere mat-
ters of form, but to the substance of what is required."
The Court repeated this injunction in *Schor* and again in
*Morrison.* See *Schor, supra, at* 854 (stating that the Court
must look "'beyond form to the substance of what' Con-
gress has done"); *Morrison,* 487 U. S., at 689–690 ("The
analysis contained in our removal cases is designed *not to
define rigid categories* of those officials who may or may
not be removed at will by the President," but rather asks
whether, given the "functions of the officials in question,"
a removal provision "interfere[s] with the President's
exercise of the 'executive power'" (emphasis added)). The
Court has thereby written into law Justice Jackson's wise
perception that "the Constitution . . . contemplates that
practice will integrate the dispersed powers into *a worka-
ble government." Youngstown Sheet & Tube Co.* v. *Sawyer,*
343 U. S. 579, 635 (1952) (opinion concurring in judgment)
(emphasis added). See also *ibid.* ("The actual art of gov-
erning under our Constitution does not and cannot con-
form to judicial definitions of the power of any of its
branches based on isolated clauses or even single Articles
torn from context").

It is not surprising that the Court in these circum-
stances has looked to function and context, and not to
bright-line rules. For one thing, that approach embodies
the intent of the Framers. As Chief Justice Marshall long

ago observed, our Constitution is fashioned so as to allow the three coordinate branches, including this Court, to exercise practical judgment in response to changing conditions and "exigencies," which at the time of the founding could be seen only "dimly," and perhaps not at all. *McCulloch,* 4 Wheat., at 415.

For another, a functional approach permits Congress and the President the flexibility needed to adapt statutory law to changing circumstances. That is why the "powers conferred upon the Federal Government by the Constitution were phrased in language broad enough to allow for the expansion of the Federal Government's role" over time. *New York* v. *United States,* 505 U. S. 144, 157 (1992). Indeed, the Federal Government at the time of the founding consisted of about 2,000 employees and served a population of about 4 million. See Kaufman, The Growth of the Federal Personnel System, in The Federal Government Service 7, 8 (W. Sayre 2d ed. 1965); Dept. of Commerce, Census Bureau, Historical Statistics of the United States: Colonial Times to 1970, pt. 1, p. 8 (1975). Today, however, the Federal Government employs about *4.4 million workers* who serve a Nation of more than 310 million people living in a society characterized by rapid technological, economic, and social change. See Office of Management and Budget, Analytical Perspectives, Budget of the U. S. Government, Fiscal Year 2010, p. 368 (2009).

Federal statutes now require or permit Government officials to provide, regulate, or otherwise administer, not only foreign affairs and defense, but also a wide variety of such subjects as taxes, welfare, social security, medicine, pharmaceutical drugs, education, highways, railroads, electricity, natural gas, nuclear power, financial instruments, banking, medical care, public health and safety, the environment, fair employment practices, consumer protection and much else besides. Those statutes create a host of different organizational structures. Sometimes

they delegate administrative authority to the President
directly, *e.g.,* 10 U. S. C. §2031(a)(1); 42 U. S. C. §5192(c);
sometimes they place authority in a long-established
Cabinet department, *e.g.,* 7 U. S. C. §1637b(c)(1); 12
U. S. C. §5221(b)(2) (2006 ed., Supp. II); sometimes they
delegate authority to an independent commission or board,
*e.g.,* 15 U. S. C. §4404(b); 28 U. S. C. §994; sometimes they
place authority directly in the hands of a single senior
administrator, *e.g.,* 15 U. S. C. §657d(c)(4); 42 U. S. C.
§421; sometimes they place it in a sub-cabinet bureau,
office, division or other agency, *e.g.,* 18 U. S. C. §4048;
sometimes they vest it in multimember or multiagency
task groups, *e.g.* 5 U. S. C. §§593–594; 50 U. S. C. §402
(2006 ed. and Supp. II); sometimes they vest it in commis-
sions or advisory committees made up of members of more
than one branch, *e.g.,* 20 U. S. C. §42(a); 28 U. S. C.
§991(a) (2006 ed., Supp. II); 42 U. S. C. §1975; sometimes
they divide it among groups of departments, commissions,
bureaus, divisions, and administrators, *e.g.,* 5 U. S. C.
§9902(a) (2006 ed., Supp. II); 7 U. S. C. §136i–1(g); and
sometimes they permit state or local governments to
participate as well, *e.g.,* 7 U. S. C. §2009aa–1(a). Statutes
similarly grant administrators a wide variety of powers—
for example, the power to make rules, develop informal
practices, investigate, adjudicate, impose sanctions, grant
licenses, and provide goods, services, advice, and so forth.
See generally 5 U. S. C. §500 *et seq.*

The upshot is that today vast numbers of statutes gov-
erning vast numbers of subjects, concerned with vast
numbers of different problems, provide for, or foresee,
their execution or administration through the work of
administrators organized within many different kinds of
administrative structures, exercising different kinds of
administrative authority, to achieve their legislatively
mandated objectives. And, given the nature of the Gov-
ernment's work, it is not surprising that administrative

units come in many different shapes and sizes.

The functional approach required by our precedents recognizes this administrative complexity and, more importantly, recognizes the various ways presidential power operates within this context—and the various ways in which a removal provision might affect that power. As human beings have known ever since Ulysses tied himself to the mast so as safely to hear the Sirens' song, sometimes it is necessary to disable oneself in order to achieve a broader objective. Thus, legally enforceable commitments—such as contracts, statutes that cannot instantly be changed, and, as in the case before us, the establishment of independent administrative institutions—hold the potential to empower precisely because of their ability to constrain. If the President seeks to regulate through impartial adjudication, then insulation of the adjudicator from removal at will can help him achieve that goal. And to free a technical decisionmaker from the fear of removal without cause can similarly help create legitimacy with respect to that official's regulatory actions by helping to insulate his technical decisions from nontechnical political pressure.

Neither is power always susceptible to the equations of elementary arithmetic. A rule that takes power from a President's friends and allies may weaken him. But a rule that takes power from the President's opponents may strengthen him. And what if the rule takes power from a functionally *neutral* independent authority? In that case, it is difficult to predict how the President's power is affected in the abstract.

These practical reasons not only support our precedents' determination that cases such as this should examine the specific functions and context at issue; they also indicate that judges should hesitate before second-guessing a "for cause" decision made by the other branches. See, *e.g., Chadha*, 462 U. S., at 944 (applying a "presumption that

the challenged statute is valid"); *Bowsher*, 478 U. S., at
736 (STEVENS, J., concurring in judgment). Compared to
Congress and the President, the Judiciary possesses an
inferior understanding of the realities of administration,
and the manner in which power, including and most espe-
cially political power, operates in context.

There is no indication that the two comparatively more
expert branches were divided in their support for the "for
cause" provision at issue here. In this case, the Act em-
bodying the provision was passed by a vote of 423 to 3 in
the House of Representatives and a by vote of 99 to 0 in the
Senate. 148 Cong. Rec. 14458, 14505 (2002). The creation
of the Accounting Board was discussed at great length in
both bodies without anyone finding in its structure any
constitutional problem. See *id.,* at 12035–12037, 12112–
12132, 12315–12323, 12372–12377, 12488–12508, 12529–
12534, 12612–12618, 12673–12680, 12734–12751, 12915–
12960, 13347–13354, 14439–14458, 14487–14506. The
President signed the Act. And, when he did so, he issued a
signing statement that critiqued multiple provisions of the
Act but did not express any separation-of-powers concerns.
See President's Statement on Signing the Sarbanes-Oxley
Act of 2002, 30 Weekly Comp. of Pres. Doc. 1286 (2002). Cf.
ABA, Report of Task Force on Presidential Signing State-
ments and the Separation of Powers Doctrine 15 (2006),
online at http://www.signingstatementsaba_final_signing_
statements_recommendations-report_7-24-06.pdf (all Inter-
net materials as visited June 24, 2010, and available in
Clerk of Court's case file) (noting that President Bush
asserted "over 500" "constitutional objections" through
signing statements "in his first term," including 82 "related
to his theory of the 'unitary executive'").

Thus, here, as in similar cases, we should decide the
constitutional question in light of the provision's practical
functioning in context. And our decision should take
account of the Judiciary's comparative lack of institutional

expertise.

## II

## A

To what extent then is the Act's "for cause" provision likely, as a practical matter, to limit the President's exercise of executive authority? In practical terms no "for cause" provision can, in isolation, define the full measure of executive power. This is because a legislative decision to place ultimate administrative authority in, say, the Secretary of Agriculture rather than the President, the way in which the statute defines the scope of the power the relevant administrator can exercise, the decision as to who controls the agency's budget requests and funding, the relationships between one agency or department and another, as well as more purely political factors (including Congress' ability to assert influence) are more likely to affect the President's power to get something done. That is why President Truman complained that "'the powers of the President amount to'" bringing "'people in and try[ing] to persuade them to do what they ought to do without persuasion.'" C. Rossiter, The American Presidency 154 (2d rev. ed. 1960). And that is why scholars have written that the President "is neither dominant nor powerless" in his relationships with many Government entities, "whether denominated executive or independent." Strauss, The Place of Agencies in Government: Separation of Powers and the Fourth Branch, 84 Colum. L. Rev. 573, 583 (1984) (hereinafter Strauss). Those entities "are *all* subject to presidential direction in significant aspects of their functioning, and [are each] able to resist presidential direction in others." *Ibid.* (emphasis added).

Indeed, notwithstanding the majority's assertion that the removal authority is "*the* key" mechanism by which the President oversees inferior officers in the independent agencies, *ante,* at 20, it appears that no President has ever

actually sought to exercise that power by testing the scope of a "for cause" provision. See Bruff, Bringing the Independent Agencies in from the Cold, 62 Vanderbilt L. Rev. En Banc 63, 68 (2009), online at http://vanderbiltlawreview. org/articles/2009/11/Bruff-62-Vand-L-Rev-En-Banc-63.pdf (noting that "Presidents do not test the limits of their power by removing commissioners . . . "); Lessig & Sunstein 110–112 (noting that courts have not had occasion to define what constitutes "cause" because Presidents rarely test removal provisions).

But even if we put all these other matters to the side, we should still conclude that the "for cause" restriction before us will not restrict presidential power significantly. For one thing, the restriction directly limits, not the President's power, but the power of an already independent agency. The Court seems to have forgotten that fact when it identifies its central constitutional problem: According to the Court, the President "is powerless to intervene" if he has determined that the Board members' "conduct merit[s] removal" because "[t]hat decision is vested instead in other tenured officers—the Commissioners—none of whom is subject to the President's direct control." *Ante,* at 14–15. But so long as the President is *legitimately* foreclosed from removing the *Commissioners* except for cause (as the majority assumes), nullifying the Commission's power to remove Board members only for cause will not resolve the problem the Court has identified: The President will *still* be "powerless to intervene" by removing the Board members if the Commission reasonably decides not to do so.

In other words, the Court fails to show why *two* layers of "for cause" protection—Layer One insulating the Commissioners from the President, and Layer Two insulating the Board from the Commissioners—impose any more serious limitation upon the *President's* powers than *one* layer. Consider the four scenarios that might arise:

1. The President and the Commission both want to

keep a Board member in office. Neither layer is relevant.

2. The President and the Commission both want to dismiss a Board member. Layer Two stops them both from doing so without cause. The President's ability to remove the Commission (Layer One) is irrelevant, for he and the Commission are in agreement.

3. The President wants to dismiss a Board member, but the Commission wants to keep the member. Layer One allows the Commission to make that determination notwithstanding the President's contrary view. Layer Two is irrelevant because the Commission does not seek to remove the Board member.

4. The President wants to keep a Board member, but the Commission wants to dismiss the Board member. Here, Layer Two *helps the President,* for it hinders the Commission's ability to dismiss a Board member whom the President wants to keep in place.

Thus, the majority's decision to eliminate only *Layer Two* accomplishes virtually nothing. And that is because a removal restriction's effect upon presidential power depends not on the presence of a "double-layer" of for-cause removal, as the majority pretends, but rather on the real-world nature of the President's relationship with the Commission. If the President confronts a Commission that seeks to *resist* his policy preferences—a distinct possibility when, as here, a Commission's membership must reflect both political parties, 15 U. S. C. §78d(a)—the restriction on the *Commission's* ability to remove a Board member is either irrelevant (as in scenario 3) or may actually help the President (as in scenario 4). And if the President faces a Commission that seeks to *implement* his policy preferences, Layer One is irrelevant, for the Presi-

dent and Commission see eye to eye.

In order to avoid this elementary logic, the Court creates two alternative scenarios. In the first, the Commission and the President *both* want to remove a Board member, but have varying judgments as to whether they have good "cause" to do so—*i.e.,* the President and the Commission both conclude that a Board member should be removed, but disagree as to whether that conclusion (which they have both reached) is *reasonable. Ante,* at 14–15. In the second, the President wants to remove a Board member and the Commission disagrees; but, notwithstanding its freedom to make reasonable decisions independent of the President (afforded by Layer One), the Commission (while apparently telling the President that it agrees with him and would like to remove the Board member) uses Layer Two as an "excuse" to pursue its actual aims—an excuse which, given Layer One, it does not need. *Ante,* at 15, n. 4.

Both of these circumstances seem unusual. I do not know if they have ever occurred. But I do not deny their logical possibility. I simply doubt their importance. And the fact that, with respect to the President's power, the double layer of for-cause removal sometimes might help, sometimes might hurt, leads me to conclude that its overall effect is at most indeterminate.

But once we leave the realm of hypothetical logic and view the removal provision at issue in the context of the entire Act, its lack of practical effect becomes readily apparent. That is because the statute provides the Commission with full authority and virtually comprehensive control over all of the Board's functions. Those who created the Accounting Board modeled it, in terms of structure and authority, upon the semiprivate regulatory bodies prevalent in the area of financial regulation, such as the New York Stock Exchange and other similar self-regulating organizations. See generally Brief for Former Chairmen of the SEC as *Amici Curiae* (hereinafter Brief

for Former SEC Chairmen). And those organizations—
which rely on private financing and on officers drawn from
the private sector—exercise rulemaking and adjudicatory
authority that is pervasively controlled by, and is indeed
"entirely derivative" of, the SEC. See *National Assn. of
Securities Dealers, Inc.* v. *SEC,* 431 F. 3d 803, 806 (CADC
2005).

Adhering to that model, the statute here gives the Ac-
counting Board the power to adopt rules and standards
"relating to the preparation of audit reports"; to adjudicate
disciplinary proceedings involving accounting firms that
fail to follow these rules; to impose sanctions; and to en-
gage in other related activities, such as conducting inspec-
tions of accounting firms registered as the law requires
and investigations to monitor compliance with the rules
and related legal obligations. See 15 U. S. C. §§7211–
7216. But, at the same time,

- No Accounting Board rule takes effect unless and
  until the Commission approves it, §7217(b)(2);
- The Commission may "abrogat[e], delet[e] or ad[d] to"
  any rule or any portion of a rule promulgated by the
  Accounting Board whenever, in the Commission's
  view, doing so "further[s] the purposes" of the securi-
  ties and accounting-oversight laws, §7217(b)(5);
- The Commission may review any sanction the
  Board imposes and "enhance, modify, cancel, re-
  duce, or require the remission of" that sanction if it
  find's the Board's action not "appropriate,"
  §§7215(e), 7217(c)(3);
- *The Commission may promulgate rules restricting
  or directing the Accounting Board's conduct of all
  inspections and investigations,* §§7211(c)(3),
  7214(h), 7215(b)(1)–(4);
- *The Commission may itself initiate any investigation
  or promulgate any rule within the Accounting
  Board's purview,* §7202, *and may also remove any*

> *Accounting Board member who has unreasonably
> "failed to enforce compliance with" the relevant
> "rule[s], or any professional standard,"* §7217(d)(3)(C)
> (emphasis added)*;*
> - *The Commission may at any time "relieve the Board
>   of any responsibility to enforce compliance with any
>   provision" of the Act, the rules, or professional stan-
>   dards if, in the Commission's view, doing so is in
>   "the public interest,"* §7217(d)(1) (emphasis added).

As these statutory provisions make clear, the Court is
simply wrong when it says that "the Act nowhere gives the
Commission effective power to start, stop, or alter" Board
investigations. *Ante,* at 23–24. On the contrary, the
Commission's control over the Board's investigatory and
legal functions is virtually absolute. Moreover, the Com-
mission has general supervisory powers over the Account-
ing Board itself: It controls the Board's budget, §§7219(b),
(d)(1); it can assign to the Board any "duties or functions"
that it "determines are necessary or appropriate,"
§7211(c)(5); it has full "oversight and enforcement author-
ity over the Board," §7217(a), *including the authority to
inspect the Board's activities whenever it believes it "ap-
propriate" to do so,* §7217(d)(2) (emphasis added). And it
can censure the Board or its members, as well as remove
the members from office, if the members, for example, fail
to enforce the Act, violate any provisions of the Act, or
abuse the authority granted to them under the Act,
§7217(d)(3). Cf. *Shurtleff* v. *United States*, 189 U. S. 311,
314–319 (1903) (holding that removal authority is not
always "restricted to a removal for th[e] causes" set forth
by statute); *Bowsher,* 478 U. S., at 729 (rejecting the "ar-
guable premis[e]" "that the enumeration of certain speci-
fied causes of removal excludes the possibility of removal
for other causes"). Contra, *ante,* at 22, n. 7. See generally
Pildes, Putting Power Back into Separation of Powers
Analysis: Why the SEC-PCAOB Structure is Constitu-

tional, 62 Vand. L. Rev. En Banc 85 (2009), online at http://vanderbiltlawreview.org/articles/2009/11/Pildes-62-Vand-L-Rev-En-Banc-85.pdf (explaining further the comprehensive nature of the Commission's powers).

What is left? The Commission's inability to remove a Board member whose perfectly *reasonable* actions cause the Commission to overrule him with great frequency? What is the practical likelihood of that occurring, or, if it does, of the President's serious concern about such a matter? Everyone concedes that the President's control over the Commission is constitutionally sufficient. See *Humphrey's Executor,* 295 U. S. 602; *Wiener,* 357 U. S. 349; *ante,* at 1–2. And if the President's control over the Commission is sufficient, and the Commission's control over the Board is virtually absolute, then, as a practical matter, the President's control over the Board should prove sufficient as well.

B

At the same time, Congress and the President had good reason for enacting the challenged "for cause" provision. First and foremost, the Board adjudicates cases. See 15 U. S. C. §7215. This Court has long recognized the appropriateness of using "for cause" provisions to protect the personal independence of those who even only sometimes engage in adjudicatory functions. *Humphrey's Executor, supra,* at 623–628; see also *Wiener*, *supra,* at 355–356; *Morrison,* 487 U. S., at 690–691, and n. 30; *McAllister* v. *United States*, 141 U. S. 174, 191–201 (1891) (Field, J., dissenting). Indeed, as early as 1789 James Madison stated that "there may be strong reasons why an" executive "officer" such as the Comptroller of the United States "should not hold his office at the pleasure of the Executive branch" if one of his "principal dut[ies]" "partakes strongly of the judicial character." 1 Annals of Congress 611–612; cf. *ante,* at 19, n. 6 (noting that the statute Congress ulti-

mately enacted limited Presidential control over the Comptroller in a different fashion); see *supra,* at 4. The Court, however, all but ignores the Board's adjudicatory functions when conducting its analysis. See, *e.g., ante,* at 17–18. And when it finally does address that central function (in a footnote), it simply asserts that the Board *does not "perform* adjudicative . . . functions," a*nte,* at 26, n. 10 (emphasis added), an assertion that is inconsistent with the terms of the statute. See §7215(c)(1) (governing "proceeding[s] by the Board to determine whether a registered public accounting firm, or an associated person thereof, should be disciplined").

Moreover, in addition to their adjudicative functions, the Accounting Board members supervise, and are themselves, technical professional experts. See §7211(e)(1) (requiring that Board members "have a demonstrated" technical "understanding of the responsibilities" and "obligations of accountants with respect to the preparation and issuance of audit reports"). This Court has recognized that the "difficulties involved in the preparation of" sound auditing reports require the application of "scientific accounting principles." *United States* v. *Anderson*, 269 U. S. 422, 440 (1926). And this Court has recognized the constitutional legitimacy of a justification that rests agency independence upon the need for technical expertise. See *Humphrey's Executor*, *supra,* at 624–626; see also Breger & Edles, Established by Practice: The Theory and Operation of Independent Federal Agencies, 52 Admin. L. Rev. 1111, 1131–1133 (2000) (explaining how the need for administrators with "technical competence," "apolitical expertise," and skill in "scientific management" led to original creation of independent agencies) (hereinafter Breger & Edles); J. Landis, The Administrative Process 23 (1938) (similar); Woodrow Wilson, Democracy and Efficiency, 87 Atlantic Monthly 289, 299 (1901) (describing need for insulation of experts from political influences).

Here, the justification for insulating the "technical experts" on the Board from fear of losing their jobs due to political influence is particularly strong. Congress deliberately sought to provide that kind of protection. See, *e.g.,* 148 Cong. Rec. 12036, 12115, 13352–13355. It did so for good reason. See *ante,* at 3 (noting that the Accounting Board was created in response to "a series of celebrated accounting debacles"); H. R. Rep. No. 107–414, pp. 18–19 (2002) (same); Brief for Former SEC Chairmen 8–9. And historically, this regulatory subject matter—financial regulation—has been thought to exhibit a particular need for independence. See *e.g.,* 51 Cong. Rec. 8857 (1914) (remarks of Sen. Morgan upon creation of the Federal Trade Commission) ("[I]t is unsafe for an . . . administrative officer representing a great political party . . . to hold the power of life and death over the great business interests of this country. . . . That is . . . why I believe in . . . taking these business matters out of politics"). And Congress, by, for example, providing the Board with a revenue stream independent of the congressional appropriations process, §7219, helped insulate the Board from congressional, as well as other, political influences. See, *e.g.,* 148 Cong. Rec. 12036 (statement of Sen. Stabenow).

In sum, Congress and the President could reasonably have thought it prudent to insulate the adjudicative Board members from fear of purely politically based removal. Cf. *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 565 (1973) ("[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent"). And in a world in which we count on the Federal Government to regulate matters as complex as, say, nuclear-power production, the Court's assertion that we should simply learn to get by "without being" regulated "by ex-

perts" is, at best, unrealistic—at worst, dangerously so. *Ante,* at 18.

C

Where a "for cause" provision is so unlikely to restrict presidential power and so likely to further a legitimate institutional need, precedent strongly supports its constitutionality. First, in considering a related issue in *Nixon* v. *Administrator of General Services*, 433 U. S. 425 (1977), the Court made clear that when "determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Id.,* at 443. The Court said the same in *Morrison,* where it upheld a restriction on the President's removal power. 487 U. S., at 691 ("[T]he real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light"). Here, the removal restriction may somewhat diminish the *Commission's* ability to control the Board, but it will have little, if any, negative effect in respect to the President's ability to control the Board, let alone to coordinate the Executive Branch. See Part II–A, *supra.* Indeed, given *Morrison,* where the Court upheld a restriction that significantly interfered with the President's important historic power to control criminal prosecutions, a "'purely executive'" function, 487 U. S., at 687–689, the constitutionality of the present restriction would seem to follow *a fortiori.*

Second, as previously pointed out, this Court has repeatedly upheld "for cause" provisions where they restrict the President's power to remove an officer with adjudicatory responsibilities. Compare *Humphrey's Executor,* 295 U. S., at 623–628; *Wiener*, 357 U. S., at 355; *Schor,* 478

U. S., at 854; *Morrison, supra,* at 691, n. 30, with *ante,* at 17–18 (ignoring these precedents). And we have also upheld such restrictions when they relate to officials with technical responsibilities that warrant a degree of special independence. *E.g., Humphrey's Executor, supra,* at 624. The Accounting Board's functions involve both kinds of responsibility. And, accordingly, the Accounting Board's adjudicatory responsibilities, the technical nature of its job, the need to attract experts to that job, and the importance of demonstrating the nonpolitical nature of the job to the public strongly justify a statute that assures that Board members need not fear for their jobs when competently carrying out their tasks, while still maintaining the Commission as the ultimate authority over Board policies and actions. See Part II–B, *supra.*

　Third, consider how several cases fit together in a way that logically compels a holding of constitutionality here. In *Perkins,* 116 U. S., at 483, 484—which was reaffirmed in *Myers*, 272 U. S., at 127 and in *Morrison, supra,* at 689, n. 27—the Court upheld a removal restriction limiting the authority of the Secretary of the Navy to remove a "cadet-engineer," whom the Court explicitly defined as an "inferior officer." The Court said,

　　"We have no doubt that when Congress, by law, vests the appointment of inferior officers in the heads of Departments *it may limit and restrict the power of removal as it deems best for the public interest.* The constitutional authority in Congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as Congress may enact in relation to the officers so appointed." *Perkins, supra,* at 485 (emphasis added; internal quotation marks omitted).

See also *Morrison, supra,* at 723–724 (SCALIA, J., dissenting) (agreeing that the power to remove an "inferior offi-

22      FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

BREYER, J., dissenting

cer" who is appointed by a department head can be restricted). Cf. *ante,* at 30–33 (holding that SEC Commissioners are "Heads of Departments").

In *Humphrey's Executor*, the Court held that Congress may constitutionally limit the President's authority to remove certain principal officers, including heads of departments. 295 U. S., at 627–629. And the Court has consistently recognized the validity of that holding. See *Wiener, supra*; *United States* v. *Nixon*, 418 U. S. 683, 706 (1974); *Buckley*, 424 U. S., at 133–136*; Chadha*, 462 U. S., at 953, n. 16; *Bowsher*, 478 U. S., at 725–726; *Morrison, supra,* at 686–693; *Mistretta* v. *United States*, 488 U. S. 361, 410–411 (1989).

And in *Freytag*, 501 U. S., at 921, JUSTICE SCALIA stated in a concurring opinion written for four Justices, including JUSTICE KENNEDY, that "adjusting the remainder of the Constitution to compensate for *Humphrey's Executor* is a fruitless endeavor." In these Justices' view, the Court should not create a *separate* constitutional jurisprudence for the "independent agencies." That being so, the law should treat their heads as it treats other Executive Branch heads of departments. Consequently, as the Court held in *Perkins,* Congress may constitutionally "limit and restrict" the Commission's power to remove those whom they appoint (*e.g,* the Accounting Board members).

Fourth, the Court has said that "[o]ur separation-of-powers jurisprudence generally focuses on the danger of one branch's *aggrandizing its power* at the expense of another branch." *Freytag, supra*, at 878 (emphasis added); accord, *Buckley, supra*, at 129; *Schor, supra,* at 856; *Morrison, supra*, at 686; cf. *Bowsher, supra.* Indeed, it has added that "the essence of the decision in *Myers,"* which is the only one of our cases to have struck down a "for cause" removal restriction, "was the judgment that the Constitution prevents Congress from *'draw[ing] to itself . . . the power to remove.'"* *Morrison, supra,* at 686 (quoting

*Myers*, *supra*, at 161; emphasis added). Congress here has "drawn" no power to itself to remove the Board members. It has instead sought to *limit* its own power, by, for example, providing the Accounting Board with a revenue stream independent of the congressional appropriations process. See *supra,* at 19; see also Brief for Former SEC Chairmen 16. And this case thereby falls outside the ambit of the Court's most serious constitutional concern.

In sum, the Court's prior cases impose functional criteria that are readily met here. Once one goes beyond the Court's elementary arithmetical logic (*i.e.,* "one plus one is greater than one") our precedent virtually dictates a holding that the challenged "for cause" provision is constitutional.

D

We should ask one further question. Even if the "for cause" provision before us does not itself significantly interfere with the President's authority or aggrandize Congress' power, is it nonetheless necessary to adopt a bright-line rule forbidding the provision lest, through a series of such provisions, each itself upheld as reasonable, Congress might undercut the President's central constitutional role? Cf. Strauss 625–626. The answer to this question is that no such need has been shown. Moreover, insofar as the Court seeks to create such a rule, it fails. And in failing it threatens a harm that is far more serious than any imaginable harm this "for cause" provision might bring about.

The Court fails to create a bright-line rule because of considerable uncertainty about the scope of its holding— an uncertainty that the Court's opinion both reflects and generates. The Court suggests, for example, that its rule may not apply where an inferior officer "perform[s] adjudicative . . . functions." Cf. *ante,* at 26, n. 10. But the Accounting Board performs adjudicative functions. *See*

*supra,* at 17–18.   What, then, are we to make of the
Court's potential exception?  And would such an exception
apply to an administrative law judge who also has impor-
tant administrative duties beyond pure adjudication?  See,
*e.g.,* 8 CFR §1003.9, 34 CFR §81.4 (2009).   The Court
elsewhere suggests that its rule may be limited to removal
statutes that provide for "judicial review of a[n] effort to
remove" an official for cause.  *Ante,* at 22; *ante,* at 25.  But
we have previously stated that *all* officers protected by a
for-cause removal provision and later subject to termina-
tion are entitled to "notice and [a] hearing" in the "courts,"
as without such review "the appointing power" otherwise
"could remove at pleasure or for such cause as [only] it
deemed sufficient."   *Reagan* v. *United States*, 182 U. S.
419, 425 (1901); *Shurtleff*, 189 U. S., at 314; cf. *Hum-
phrey's Executor, supra* (entertaining civil suit challenging
removal).  But cf. *Bowsher, supra*, at 729.  What weight,
then, should be given to this hint of an exception?

The Court further seems to suggest that its holding may
not apply to inferior officers who have a different relation-
ship to their appointing agents than the relationship
between the Commission and the Board.  See *ante,* at 22,
24–26.  But the only characteristic of the "relationship"
between the Commission and the Board that the Court
apparently deems relevant is that the relationship in-
cludes two layers of for-cause removal.  See, *e.g., ante,* at
23 ("Broad power over Board functions is not equivalent to
the power to remove Board members").  Why then would
any different relationship that also includes two layers of
for-cause removal survive where this one has not?  Cf.
Part II–A, *supra* (describing the Commission's near abso-
lute control over the Board).  In a word, what differences
are relevant? If the Court means to state that its holding
in fact applies only where Congress has "enacted an *un-
usually high standard*" of for-cause removal—and does not
otherwise render two layers of "'ordinary'" for-cause re-

moval unconstitutional—I should welcome the statement. *Ante,* at 22 (emphasis added); see also *ante,* at 24–25, 15, 22, (underscoring this statute's "sharply circumscribed definition of what constitutes 'good cause'" and its "rigorous," "significant and unusual [removal] protections"). But much of the majority's opinion appears to avoid so narrow a holding in favor of a broad, basically mechanical rule—a rule that, as I have said, is divorced from the context of the case at hand. Compare Parts III–A, III–B, III–C, *ante*, with Parts II–A, II–B, II–C, *supra.* And such a mechanical rule cannot be cabined simply by saying that, *perhaps,* the rule does not apply to instances that, at least at first blush, seem highly similar. A judicial holding by its very nature is not "a restricted railroad ticket, good for" one "day and train only." *Smith* v. *Allwright*, 321 U. S. 649, 669 (1944) (Roberts, J., dissenting).

The Court begins to reveal the practical problems inherent in its double for-cause rule when it suggests that its rule may not apply to "the civil service." *Ante,* at 26. The "civil service" is defined by statute to include "all appointive positions in . . . the Government of the United States," excluding the military, but including *all* civil "officer[s]" up to and including those who are subject to Senate confirmation. 5 U. S. C. §§2101, 2102(a)(1)(B), 2104. The civil service thus includes many officers indistinguishable from the members of both the Commission and the Accounting Board. Indeed, as this Court recognized in *Myers,* the "competitive service"—the class within the broader civil service that enjoys the most robust career protection— "includes a *vast majority* of all the civil officers" in the United States. 272 U. S., at 173 (emphasis added); 5 U. S. C. §2102(c).

But even if I assume that the majority categorically excludes the competitive service from the scope of its new rule, cf. *ante,* at 26 (leaving this question open), the exclusion would be insufficient. This is because the Court's

"double for-cause" rule applies to appointees who are "inferior officer[s]." *Ante,* at 2. And who are they? Courts and scholars have struggled for more than a century to define the constitutional term "inferior officers," without much success. See 2 J. Story, Commentaries on the Constitution §1536, pp. 397–398 (3d ed. 1858) ("[T]here does not seem to have been any exact line drawn, who are and who are not to be deemed *inferior* officers, in the sense of the constitution"); *Edmond* v. *United States*, 520 U. S. 651, 661 (1997) ("Our cases have not set forth an exclusive criterion for [defining] inferior officers"); Memorandum from Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel, to the General Counsels of the Executive Branch: Officers of the United States Within the Meaning of the Appointments Clause, p. 3 (Apr. 16, 2007) (hereinafter OLC Memo), online at http://www.justice.gov/olc/2007/appointmentsclausev10.pdf ("[T]he Supreme Court has not articulated the precise scope and application of the [Inferior Officer] Clause's requirements"); Konecke, The Appointments Clause and Military Judges: Inferior Appointment to a Principal Office, 5 Seton Hall Const. L. J. 489, 492 (1995) (same); Burkoff, Appointment and Removal Under the Federal Constitution: The Impact of Buckley v. Valeo, 22 Wayne L. Rev. 1335, 1347, 1364 (1976) (describing our early precedent as "circular" and our later law as "not particularly useful"). The Court does not clarify the concept. But without defining who is an inferior officer, to whom the majority's new rule applies, we cannot know the scope or the coherence of the legal rule that the Court creates. I understand the virtues of a common-law case-by-case approach. But here that kind of approach (when applied without more specificity than I can find in the Court's opinion) threatens serious harm.

The problem is not simply that the term "inferior officer" is indefinite but also that efforts to define it inevitably

BREYER, J., dissenting

conclude that the term's sweep is unusually broad. Consider the Court's definitions: Inferior officers are, *inter alia,* (1) those charged with "the administration and enforcement of the public law," *Buckley,* 424 U. S., at 139; *ante,* at 2; (2) those granted "significant authority," 424 U. S., at 126; *ante,* at 25; (3) those with "responsibility for conducting civil litigation in the courts of the United States," 424 U. S., at 140; and (4) those "who can be said to hold an office," *United States* v. *Germaine*, 99 U. S. 508, 510 (1879), that has been created either by "regulations" or by "statute," *United States* v. *Mouat*, 124 U. S. 303, 307–308 (1888).

Consider the definitional conclusion that the Department of Justice more recently reached: An "inferior officer" is anyone who holds a "continuing" position and who is "invested by legal authority with a portion of the sovereign powers of the federal Government," including, *inter alia,* the power to *"arrest criminals," "seize persons or property,"* "issue regulations," "issue . . . authoritative legal opinions," *"conduc[t] civil litigation,"* "collec[t] revenue," represent "the United States to foreign nations," "command" military force, or *enter into "contracts"* on behalf "of the nation." OLC Memo 1, 4, 12–13, 15–16 (internal quotation marks omitted; emphasis added).

And consider the fact that those whom this Court has *held* to be "officers" include: (1) a district court clerk, *Hennen*, 13 Pet., at 258; (2) "thousands of clerks in the Departments of the Treasury, Interior and the othe[r]" departments, *Germaine, supra,* at 511, who are responsible for "the records, books, and papers appertaining to the office," *Hennen, supra,* at 259; (3) a clerk to "the assistant treasurer" stationed "at Boston," *United States* v. *Hartwell*, 6 Wall. 385, 392 (1868); (4 & 5) an "assistant-surgeon" and a "cadet-engineer" appointed by the Secretary of the Navy, *United States* v. *Moore*, 95 U. S. 760, 762 (1878); *Perkins*, 116 U. S., at 484; (6) election monitors, *Ex*

*parte Siebold*, 100 U. S. 371, 397–399 (1880); (7) United States attorneys, *Myers*, *supra*, at 159; (8) federal marshals, *Sieblod, supra,* at 397; *Morrison,* 487 U. S., at 676; (9) military judges, *Weiss* v. *United States*, 510 U. S., 163, 170 (1994); (10) judges in Article I courts, *Freytag,* 501 U. S., at 880–881; and (11) the general counsel of the Department of Transportation, *Edmond* v. *United States*, 520 U. S. 651 (1997).  Individual Members of the Court would add to the list the Federal Communication Commission's managing director, the Federal Trade Commission's "secretary," the general counsel of the Commodity Futures Trading Commission, and more generally, bureau chiefs, general counsels, and administrative law judges, see *Freytag*, *supra*, at 918–920 (SCALIA, J., concurring in part and concurring in judgment), as well as "ordinary commissioned military officers," *Weiss, supra,* at 182 (Souter, J., concurring).

Reading the criteria above as stringently as possible, I still see no way to avoid sweeping hundreds, perhaps thousands of high level government officials within the scope of the Court's holding, putting  their job security and their administrative actions and decisions constitutionally at risk.  To make even a conservative estimate, one would have to begin by listing federal departments, offices, bureaus and other agencies whose heads are by statute removable only "for cause."  I have found 48 such agencies, which I have listed in Appendix A, *infra*.  Then it would be necessary to identify the senior officials in those agencies (just below the top) who themselves are removable only "for cause." I have identified 573 such high-ranking officials, whom I have listed in Appendix B, *infra*.  They include most of the leadership of the Nuclear Regulatory Commission (including that agency's executive director as well as the directors of its Office of Nuclear Reactor Regulation and Office of Enforcement), virtually all of the leadership of the Social Security Administration, the

executive directors of the Federal Energy Regulatory Commission and the Federal Trade Commission, as well as the general counsels of the Chemical Safety Board, the Federal Mine Safety and Health Review Commission, and the National Mediation Board.

This list is a conservative estimate because it consists only of career appointees in the Senior Executive Service (SES), see 5 U. S. C. §§2101a, 3132(a)(2), a group of high-ranking officials distinct from the "competitive service," see §2101(a)(1)(C), who "serve in the key positions just below the top Presidential appointees," Office of Personnel Management, About the Senior Executive Service, online at http://www.opm.gov/ses/about_ses/index.asp; §2102(a)(1)(C), and who are, without exception, subject to "removal" only for cause. §§7542–7543; see also §2302(a)(2) (substantially limiting conditions under which "a career appointee in the Senior Executive Service" may be "transfer[red], or reassign[ed]"). SES officials include, for example, the Director of the Bureau of Prisons, the Director of the National Drug Intelligence Center, and the Director of the Office of International Monetary Policy in the Treasury Department. See Senate Committee on Homeland Security and Government Affairs, United States Government Policy and Supporting Positions (2008), pp. 99, 103, 129 (hereinafter Plum Book). And by virtually any definition, essentially all SES officials qualify as "inferior officers," for their duties, as defined by statute, require them to "direc[t] the work of an organizational unit," carry out high-level managerial functions, or "*otherwise exercis[e] important policy-making, policy-determining, or other executive functions*." §3132(a)(2) (emphasis added). Cf. *ante,* at 2 (describing an "inferior officer" as someone who "determines the policy and enforces the laws of the United States"); *ante,* at 26 (acknowledging that career SES appointees in independent agencies may be rendered unconstitutional in future cases). Is the SES exempt from today's rule or is it

not?  The Court, after listing reasons why the SES may be
different, simply says that it will not "addres[s]" the mat-
ter.  *Ante,* at 27.  Perhaps it does not do so because it cannot
do so without revealing the difficulty of distinguishing the
SES from the Accounting Board and thereby also revealing
the inherent instability of the legal rule it creates.

The potential list of those whom today's decision affects
is yet larger.  As JUSTICE SCALIA has observed, adminis-
trative law judges (ALJs) "are all executive officers."
*Freytag,* 501 U. S., at 910 (opinion concurring in part and
concurring in judgment) (emphasis deleted); see also, *e.g.,*
*id.,* at 881 (majority opinion) ("[A] [tax-court] special trial
judge is an 'inferior Officer'"); *Edmond, supra,* at 654
("[M]ilitary trial and appellate judges are [inferior] offi-
cers").  But cf. *ante,* at 26, n. 10.  And ALJs are each re-
movable "only for good cause established and determined
by the Merit Systems Protection Board," 5 U. S. C.
§§7521(a)–(b).  But the members of the Merit Systems
Protection Board are themselves protected from removal
by the President absent good cause.  §1202(d).

My research reflects that the Federal Government relies
on 1,584 ALJs to adjudicate administrative matters in
over 25 agencies.  See Appendix C, *infra;* see also Memo-
randum of Juanita Love, Office of Personnel Manage-
ment, to Supreme Court Library (May 28, 2010) (avail-
able in Clerk of Court's case file).  These ALJs adjudicate
Social Security benefits, employment disputes, and other
matters highly important to individuals.  Does every
losing party before an ALJ now have grounds to appeal on
the basis that the decision entered against him is uncon-
stitutional?  Cf. *ante,* at 26, n. 10 ("[O]ur holding also does
not address" this question).

And what about the military?  Commissioned military
officers "are 'inferior officers.'"  *Weiss,* 510 U. S., at 182
(Souter, J., concurring); *id.,* at 169–170 (majority opinion).
There are over 210,000 active-duty commissioned officers

currently serving in the armed forces. See Dept. of Defense, Active Duty Military Personnel by Rank (Apr. 30, 2010), online at http://siadapp.dmdc.osd.mil/personnel/MILITARY/ rg1004.pdf. Numerous statutory provisions provide that such officers may not be removed from office except for cause (at least in peacetime). See, *e.g.,* 10 U. S. C. §§629– 632, 804, 1161, 1181–1185. And such officers can generally be so removed only by *other* commissioned officers, see §§612, 825, 1187, who themselves enjoy the same career protections.

The majority might simply say that the military is different. But it will have to explain *how* it is different. It is difficult to see why the Constitution would provide a President who is the military's "commander-in-chief," Art. II, §2, cl. 1, with *less* authority to remove "inferior" military "officers" than to remove comparable civil officials. See Barron & Lederman, The Commander in Chief at the Lowest Ebb—A Constitutional History, 121 Harv. L. Rev. 941, 1102–1106 (2008) (describing President's "superintendence prerogative" over the military). Cf. *ante,* at 26–27 (not "expressing any view whatever" as to whether military officers' authority is now unconstitutional).

The majority sees "no reason . . . to address whether" any of "these positions," "or any others," might be deemed unconstitutional under its new rule, preferring instead to leave these matters for a future case. *Ante,* at 27. But what is to happen in the meantime? Is the work of all these various officials to be put on hold while the courts of appeals determine whether today's ruling applies to them? Will Congress have to act to remove the "for cause" provisions? Cf. *Buckley*, 424 U. S., at 142–143. Can the President then restore them via executive order? And, still, what about the military? A clearer line would help avoid these practical difficulties.

The majority asserts that its opinion will not affect the Government's ability to function while these many ques-

tions are litigated in the lower courts because the Court's
holding concerns only "the conditions under which th[e]se
officers might some day be removed." *Ante,* at 27. But
this case was not brought by federal officials challenging
their potential removal. It was brought by private indi-
viduals who were *subject to regulation "'here-and-now'"*
and who "object to the" very "existence" of the regulators
themselves. *Ante,* at 33, 8 (emphasis added). And those
private individuals have prevailed. Thus, any person
similarly regulated by a federal official who is potentially
subject to the Court's amorphous new rule will be able to
bring an "implied private right of action directly under the
Constitution" "seeking . . . a declaratory judgment that"
the official's actions are "unconstitutional and an injunc-
tion preventing the" official "from exercising [his] powers."
*Ante,* at 10, n. 2, 6; cf., *e.g., Legal Services Corporation* v.
*Velazquez*, 531 U. S. 533, 546 (2001) (affirming grant of
preliminary injunction to cure, *inter alia,* a separation-of-
powers violation); *Youngstown Sheet & Tube Co.*, 343 U. S.
579 (same). Such a plaintiff need not even first exhaust
his administrative remedies. *Ante,* at 7–10.

Nor is it clear that courts will always be able to cure
such a constitutional defect merely by severing an offend-
ing removal provision. For a court's "ability to devise
[such] a judicial remedy . . . often depends on how clearly"
the "background constitutional rules at issue" have been
"articulated"; severance will be unavailable "in a murky
constitutional context," which is precisely the context that
the Court's new rule creates. *Ayotte* v. *Planned Parent-
hood of Northern New Eng.*, 546 U. S. 320, 329, 330 (2006).
Moreover, "the touchstone" of the severability analysis "is
legislative intent," *id.,* at 330, and Congress has repeat-
edly expressed its judgment "over the last century that it
is in the best interest of the country, indeed essential, that
federal service should depend upon meritorious perform-
ance rather than political service," *Civil Service Comm'n*,

413 U. S., at 557; see also *Bush* v. *Lucas*, 462 U. S. 367, 380–388 (1983) (describing the history of "Congressional attention to the problem of politically-motivated removals"). And so it may well be that courts called upon to resolve the many questions the majority's opinion raises will not only apply the Court's new rule to its logical conclusion, but will also determine that the only available remedy to certain double for-cause problems is to invalidate entire agencies.

Thus, notwithstanding the majority's assertions to the contrary, the potential consequences of today's holding are worrying. The upshot, I believe, is a legal dilemma. To interpret the Court's decision as applicable only in a few circumstances will make the rule less harmful but arbitrary. To interpret the rule more broadly will make the rule more rational, but destructive.

## III

One last question: How can the Court simply *assume* without deciding that the SEC Commissioners themselves are removable only "for cause?" See *ante,* at 5 ("[W]e decide the case with th[e] *understanding"* "that the Commissioners cannot themselves be removed by the President except" for cause (emphasis added)). Unless the Commissioners themselves are *in fact* protected by a "for cause" requirement, the Accounting Board statute, on the Court's own reasoning, is not constitutionally defective. I am not aware of any other instance in which the Court has similarly (on its own or through stipulation) *created* a constitutional defect in a statute and then relied on that defect to strike a statute down as unconstitutional. Cf. *Alabama* v. *North Carolina*, 560 U. S. \_\_\_, \_\_\_ (2010) (opinion for the Court by SCALIA, J.) (slip op., at 20) ("We do not—we cannot—add provisions to a federal statute . . . especially [if] . . . separation-of-powers concerns . . . would [thereby] arise"); *The Anaconda* v. *American Sugar Refining Co.*, 322 U. S. 42, 46 (1944) (describing parties' inabil-

ity to "stipulate away" what "the legislation declares").

It is certainly not obvious that the SEC Commissioners enjoy "for cause" protection.  Unlike the statutes establishing the 48 federal agencies listed in Appendix A, *infra*, the statue that established the Commission says nothing about removal.  It *is silent* on the question.  As far as its text is concerned, the President's authority to remove the Commissioners is no different from his authority to remove the Secretary of State or the Attorney General.  See *Shurtleff,* 189 U. S., at 315 ("To take away th[e] power of removal . . . would require very clear and explicit language.  It should not be held to be taken away by mere inference or implication"); see also Memorandum from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, to the Principal Deputy Counsel to the President: Removability of the Federal Coordinator for Alaska Natural Gas Transportation Projects, p. 2 (Oct. 23, 2009), online at http://justice.gov/olc/2009/gas-transport-project.pdf ("[Where] Congress did not explicitly provide tenure protection . . . the President, consistent with . . . settled principles, may remove . . . without cause"); The Constitutional Separation of Powers Between the President and Congress, 20 Op. Legal Counsel 124, 170 (1996) (same).

Nor is the absence of a "for cause" provision in the statute that created the Commission likely to have been inadvertent.  Congress created the Commission during the 9-year period *after* this Court decided *Myers,* and thereby cast serious doubt on the constitutionality of all "for cause" removal provisions, but *before* it decided *Humphrey's Executor,* which removed any doubt in respect to the constitutionality of making commissioners of independent agencies removable only for cause.  In other words, Congress created the SEC at a time when, under this Court's precedents, it would have been *unconstitutional* to make the Commissioners removable only for cause.  And, during

that 9-year period, Congress created at least three major federal agencies without making *any* of their officers removable for cause. See 48 Stat. 885, 15 U. S. C. §78d (Securities and Exchange Commission), 48 Stat. 1066, 47 U. S. C. §154 (Federal Communications Commission); 46 Stat. 797 (Federal Power Commission) (reformed post-*Humphrey's Executor* as the Federal Energy Regulatory Commission *with* "for cause" protection, 91 Stat. 582, 42 U. S. C. §7171). By way of contrast, only *one month* after *Humphrey's Executor* was decided, Congress returned to its pre-*Myers* practice of including such provisions in statutes creating independent commissions. See §3, 49 Stat. 451, 29 U. S. C. §153 (establishing National Labor Relations Board with an explicit removal limitation).

The fact that Congress did not make the SEC Commissioners removable "for cause" does not mean it intended to create a dependent, rather than an independent agency. Agency independence is a function of several different factors, of which "for cause" protection is only one. Those factors include, *inter alia,* an agency's separate (rather than presidentially dependent) budgeting authority, its separate litigating authority, its composition as a multimember bipartisan board, the use of the word "independent" in its authorizing statute, and, above all, a political environment, reflecting tradition and function, that would impose a heavy political cost upon any President who tried to remove a commissioner of the agency without cause. See generally Breger & Edles 1135–1155.

The absence of a "for cause" provision is thus not fatal to agency independence. Indeed, a "Congressional Research Service official suggests that there are *at least* 13 'independent' agencies without a removal provision in their statutes." *Id.,* at 1143, n. 161 (emphasis added) (citing congressional testimony). But it does draw the majority's rule into further confusion. For not only are we left without a definition of an "inferior officer," but we are also left

to guess which department heads will be deemed by the majority to be subject to for-cause removal notwithstanding statutes containing no such provision. If any agency deemed "independent" will be similarly treated, the scope of the majority's holding is even broader still. See Appendix D, *infra* (listing agencies potentially affected).

The Court then, by assumption, reads *into* the statute books a "for cause removal" phrase that does not appear in the relevant statute and which Congress probably did not intend to write. And it does so in order to strike down, not to uphold, another statute. This is not a statutory construction that seeks to avoid a constitutional question, but its opposite. See *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring) ("It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case" (internal quotation marks omitted)); *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 500 (1979) ("[A]n Act of Congress ought not to be construed to violate the Constitution if any other possible construction remains available").

I do not need to decide whether the Commissioners are in fact removable only "for cause" because I would uphold the Accounting Board's removal provision as constitutional regardless. But were that not so, a determination that the silent SEC statute means no more than it says would properly avoid the determination of unconstitutionality that the Court now makes.

\*      \*      \*

In my view the Court's decision is wrong—very wrong. As Parts II–A, II–B, and II–C of this opinion make clear, if the Court were to look to the proper functional and contextual considerations, it would find the Accounting Board provision constitutional. As Part II–D shows, insofar as the Court instead tries to create a bright-line rule, it fails to do so. Its rule of decision is both imprecise and overly

BREYER, J., dissenting

broad. In light of the present imprecision, it must either narrow its rule arbitrarily, leaving it to apply virtually alone to the Accounting Board, or it will have to leave in place a broader rule of decision applicable to many other "inferior officers" as well. In doing the latter, it will undermine the President's authority. And it will create an obstacle, indeed pose a serious threat, to the proper functioning of that workable Government that the Constitution seeks to create—in provisions this Court is sworn to uphold.

With respect I dissent.

APPENDIXES
A

There are 24 stand-alone federal agencies (*i.e., "*depart-ments") whose heads are, *by statute,* removable by the President only "for cause."  Moreover, there are at least 24 additional offices, boards, or bureaus situated within departments that are similarly subject, *by statute,* to for-cause removal provisions.  The chart below first lists the 24 departments and then lists the 24 additional offices, boards, and bureaus.  I have highlighted those instances in which a "for-cause" office is situated within a "for-cause" department—*i.e.,* instances of "double for-cause" removal that are essentially indistinguishable from this case (with the notable exception that the Accounting Board may *not* be *statutorily* subject to two layers of for-cause removal, cf. Part III, *supra*).  This list does not include instances of "double for-cause" removal that arise in Article I courts, although such instances might also be affected by the majority's holding, cf. *ante,* at 26, n. 10.  Compare 48 U. S. C. §§1424(a), 1614(a), with 28 U. S. C. §§631(a), (i), and 18 U. S. C. §§23, 3602(a).

|  | **Department** | **Statutory Removal Provision** |
|---|---|---|
| 1 | Chemical Safety Board | "Any member of the Board, including the Chairperson, may be removed for inefficiency, neglect of duty, or malfeasance in office."  42  U. S. C. §7412(r)(6)(B) |
| 2 | Commission on Civil Rights | "The President may remove a member of the Commission only for neglect of duty or malfeasance in office."  42 U. S. C. §1975(e) |
| 3 | Consumer Product Safety Commission | "Any member of the Commission may be removed by the President for neglect of duty or malfeasance in office but for no other cause."  15 U. S. C. §2053(a) |

Appendix A to opinion of BREYER, J.

|    | Department | Statutory Removal Provision |
|----|------------|-----------------------------|
| 4  | Federal Energy Regulatory Commission | "Members shall hold office for a term of 5 years and may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 42 U. S. C. §7171(b)(1) |
| 5  | Federal Labor Relations Authority | "Members of the Authority shall be appointed by the President by and with the advice and consent of the Senate, and may be removed by the President only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office." 5 U. S. C. §7104(b) |
| 6  | Federal Maritime Commission | "The President may remove a Commissioner for inefficiency, neglect of duty, or malfeasance in office." 46 U. S. C. §301(b)(3) |
| 7  | Federal Mine Safety and Health Review Commission | "Any member of the Commission may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." 30 U. S. C. §823(b)(1) |
| 8  | Federal Reserve Board | "[E]ach member shall hold office for a term of fourteen years from the expiration of the term of his predecessor, unless sooner removed for cause by the President." 12 U. S. C. §242 |
| 9  | Federal Trade Commission | "Any commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." 15 U. S. C. §41 |
| 10 | Independent Medicare Advisory Board | "Any appointed member may be removed by the President for neglect of duty or malfeasance in office, but for no other cause." Pub. L. 111–148, §3403. |
| 11 | Merit Systems Protection Board | "Any member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U. S. C. §1202(d) |

Appendix A to opinion of BREYER, J.

| | Department | Statutory Removal Provision |
|---|---|---|
| 12 | National Labor Relations Board | "Any member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." 29 U. S. C. §153(a) |
| 13 | National Mediation Board | "A member of the Board may be removed by the President for inefficiency, neglect of duty, malfeasance in office, or ineligibility, but for no other cause." 45 U. S. C. §154 |
| 14 | National Transportation Safety Board | "The President may remove a member for inefficiency, neglect of duty, or malfeasance in office." 49 U. S. C. §1111(c) |
| 15 | Nuclear Regulatory Commission | "Any member of the Commission may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." 42 U. S. C. §5841(e) |
| 16 | Occupational Safety and Health Review Commission | "A member of the Commission may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." 29 U. S. C. §661(b) |
| 17 | Office of Special Counsel | "The Special Counsel may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U. S. C. §1211(b) |
| 18 | Postal Regulatory Commission | "The Commissioners shall be chosen solely on the basis of their technical qualifications, professional standing, and demonstrated expertise in economics, accounting, law, or public administration, and may be removed by the President only for cause." 39 U. S. C. §502(a) |

Appendix A to opinion of BREYER, J.

|    | Department | Statutory Removal Provision |
|----|------------|------------------------------|
| 19 | Postal Service* | "The exercise of the power of the Postal Service shall be directed by a Board of Governors composed of 11 members . . . . The Governors shall not be representatives of specific interests using the Postal Service, and may be removed only for cause." 39 U. S. C. §202 |
| 20 | Social Security Administration | "[The] Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." 42 U. S. C. §902(a)(3) |
| 21 | United States Institute of Peace* | "A member of the Board appointed under subsection (b)(5) . . . may be removed by the President . . . in consultation with the Board, for conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties." 22 U. S. C. §4605(f) |
| 22 | United States Sentencing Commission | "The Chair, Vice Chairs, and members of the Commission shall be subject to removal from the Commission by the President only for neglect of duty or malfeasance in office or for other good cause shown." 28 U. S. C. §991(a) |
| 23 | Legal Services Corporation* | "A member of the Board may be removed by a vote of seven members for malfeasance in office or for persistent neglect of or inability to discharge duties, or for offenses involving moral turpitude, and for no other cause." 42 U. S. C. §2996c(e) |
| 24 | State Justice Institute* | "A member of the Board may be removed by a vote of seven members for malfeasance in office, persistent neglect of, or inability to discharge duties, or for any offense involving moral turpitude, but for no other cause." 42 U. S. C. §10703(h) |

———————

*See *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374 (1995).

Appendix A to opinion of BREYER, J.

| | **Office Within Department** | **Statutory Removal Provision** |
|---|---|---|
| 25 | Department of Agriculture: National Appeals Division | "The Division shall be headed by a Director, appointed by the Secretary from among persons who have substantial experience in practicing administrative law. . . . The Director shall not be subject to removal during the term of office, except for cause established in accordance with law."  7 U. S. C. §§6992(b)(1)–(2) |
| 26 | Department of Agriculture: Regional Fishery Management Councils | "The Secretary may remove for cause any member of a Council required to be appointed by the Secretary . . . ."  16 U. S. C. §1852(b)(6) |
| 27 | Department of Commerce: Corporation for Travel Promotion† | "The Secretary of Commerce may remove any member of the board [of the Corporation] for good cause."  124 Stat. 57 |
| 28 | Department of Defense: Office of Navy Reserve | "The Chief of Navy Reserve is appointed for a term determined by the Chief of Naval Operations, normally four years, but may be removed for cause at any time." 10 U. S. C. §5143(c)(1) |
| 29 | Department of Defense: Office of Marine Forces Reserve | "The Commander, Marine Forces Reserve, is appointed for a term determined by the Commandant of the Marine Corps, normally four years, but may be removed for cause at any time." 10 U. S. C. §5144(c)(1) |
| 30 | Department of Defense: Office of Air Force Reserve | "The Chief of Air Force Reserve is appointed for a period of four years, but may be removed for cause at any time." 10 U. S. C. §8038(c)(1) |
| 31 | Department of Defense: Joint Staff of the National Guard Bureau | "[A]n officer appointed as Director of the Joint Staff of the National Guard Bureau serves for a term of four years, but may be removed from office at any time for cause."  10 U. S. C. §10505(a)(3)(A) |

--------

†See *Lebron, supra.*

Appendix A to opinion of BREYER, J.

|    | Office Within Department | Statutory Removal Provision |
|----|--------------------------|------------------------------|
| 32 | Department of Defense: Board of Actuaries | "A member of the Board may be removed by the Secretary of Defense only for misconduct or failure to perform functions vested in the Board." 10 U. S. C. A. §183(b)(3) (2010) |
| 33 | Department of Defense: Medicare-Eligible Retiree Health Care Board of Actuaries | "A member of the Board may be removed by the Secretary of Defense for misconduct or failure to perform functions vested in the Board, and for no other reason." 10 U. S. C. §1114(a)(2)(A) |
| 34 | Department of Education: Performance-Based Organization for the Delivery of Federal Student Financial Assistance | "The Chief Operating Officer may be removed by . . . the President; or . . . the Secretary, for misconduct or failure to meet performance goals set forth in the performance agreement in paragraph (4)." 20 U. S. C. §1018(d)(3) |
| 35 | Federal Labor Relations Authority: Foreign Service Labor Relations Board (see *supra,* row 5) | "The Chairperson [of the FLRA, who also chairs the Board] may remove any other Board member . . . for corruption, neglect of duty, malfeasance, or demonstrated incapacity to perform his or her functions . . . ." 22 U. S. C. §4106(e) |
| 36 | General Services Administration: Civilian Board of Contract Appeals (see *supra,* row 11) | "Members of the Civilian Board shall be subject to removal in the same manner as administrative law judges, *[i.e.,* 'only for good cause established and determined *by the Merit Systems Protection Board.']*" 41 U. S. C. §438(b)(2) (emphasis added) |
| 37 | Department of Health and Human Services: National Advisory Council on National Health Service Corps | "No member shall be removed, except for cause." 42 U. S. C. §254j(b) |

Appendix A to opinion of BREYER, J.

|    | **Office Within Department** | **Statutory Removal Provision** |
|----|------------------------------|----------------------------------|
| 38 | Department of Health and Human Services: Medicare & Medicaid Office of the Chief Actuary | "The Chief Actuary may be removed only for cause."  42 U. S. C. §1317(b)(1) |
| 39 | Department of Homeland Security: Office of the Coast Guard Reserve | "An officer may be removed from the position of Director for cause at any time."  14 U. S. C. §53(c)(1) |
| 40 | Department of the Interior: National Indian Gaming Commission | "A Commissioner may only be removed from office before the expiration of the term of office of the member by the President (or, in the case of associate member, by the Secretary) for neglect of duty, or malfeasance in office, or for other good cause shown."  25 U. S. C. §2704(b)(6) |
| 41 | Library of Congress: Copyright Royalty Judgeships | "The Librarian of Congress may sanction or remove a Copyright Royalty Judge for violation of the standards of conduct adopted under subsection (h), misconduct, neglect of duty, or any disqualifying physical or mental disability."  17 U. S. C. §802(i) |
| 42 | Postal Service: Inspector General (see *supra,* row 19) | "The Inspector General may at any time be removed upon the written concurrence of at least 7 Governors, but only for cause."  39 U. S. C. §202(e)(3) |
| 43 | Securities and Exchange Commission: Public Company Accounting Oversight Board | "A member of the Board may be removed by the Commission from office . . . for good cause shown . . . ."  15 U. S. C. §7211(e)(6) |
| 44 | Social Security Administration: Office of the Chief Actuary (see *supra,* row 20) | "The Chief Actuary may be removed only for cause."  42 U. S. C. §902(c)(1) |

Appendix A to opinion of BREYER, J.

|   | Office Within Department | Statutory Removal Provision |
|---|---|---|
| 45 | Department of State: Foreign Service Grievance Board | "The Secretary of State may, upon written notice, remove a Board member for corruption, neglect of duty, malfeasance, or demonstrated incapacity to perform his or her functions, established at a hearing (unless the right to a hearing is waived in writing by the Board member)." 22 U. S. C. §4135(d) |
| 46 | Department of Transportation: Air Traffic Services Committee | "Any member of the Committee may be removed for cause by the Secretary." 49 U. S. C. §106(p)(6)(G) |
| 47 | Department of Transportation: Surface Transportation Board | "The President may remove a member for inefficiency, neglect of duty, or malfeasance in office." 49 U. S. C. §701(b)(3) |
| 48 | Department of Veterans Affairs: Board of Veterans Appeals | "The Chairman may be removed by the President for misconduct, inefficiency, neglect of duty, or engaging in the practice of law or for physical or mental disability which, in the opinion of the President, prevents the proper execution of the Chairman's duties. The Chairman may not be removed from office by the President on any other grounds." 38 U. S. C. §7101(b)(2) |

46      FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Appendix B to opinion of BREYER, J.

B

The table that follows lists the 573 career appointees in the Senior Executive Service (SES) who constitute the upper level management of the independent agencies listed in Appendix A, *supra.* Each of these officials is, under any definition—including the Court's—an inferior officer, and is, by statute, subject to two layers of for-cause removal. See *supra,* at 25–30.

The data are organized into three columns: The first column lists the "office" to which the corresponding official is assigned within the respective agency and, where available, the provision of law establishing that office. Cf. *supra,* at 27 (citing *Mouat,* 124 U. S., at 307–308; *Germaine,* 99 U. S., at 510). The second and third columns respectively list the career appointees in each agency who occupy "general" and "reserved" SES positions. A "general" position is one that could be filled by either a career appointee or by a noncareer appointee were the current (career) occupant to be replaced. See 5 U. S. C. §3132(b)(1). Because 90% of *all* SES positions must be filled by career appointees, §3134(b), "most General positions are filled by career appointees," Plum Book 200. A "reserved" position, by contrast, must always be filled by a career appointee. §3132(b)(1). The data for the "general position" column come from the 2008 Plum Book, a quadrennial manual prepared by the congressional committees responsible for government oversight. See *supra,* at 29. Positions listed as vacant in that source are not included. The data for the "reserved position" column come from a list periodically published by the Office of Personnel Management and last published in 2006. See 72 Fed. Reg. 16154–16251 (2007); §3132(b)(4). Given the Federal Government's size and the temporal lag between the underlying sources, the list that follows is intended to be illustrative, not exact.

Appendix B to opinion of BREYER, J.

| Nuclear Regulatory Commission (192) | | |
|---|---|---|
| *Office* | *General Position* | *Reserved Position* |
| Office of the Executive Director for Operations 10 CFR §1.32 (2009) | Executive Director | Director of Nuclear Security Projects |
| | Deputy Executive Director for Reactor and Preparedness Programs | |
| | Deputy Executive Director for Materials, Waste, Research, State, Tribal, and Compliance, Programs | |
| | Deputy Executive Director for Corporate Management | |
| | Assistant for Operations | |
| | Director for Strategic Organizational Planning and Optimization | |
| Office of the Secretary 10 CFR §1.25 | Secretary | |
| Office of the Chief Financial Officer 10 CFR §1.31 | Chief Financial Officer | Director, Division of Planning, Budget and Analysis |
| | | Director, Division of Financial Services |
| | | Deputy Chief Financial Officer |
| | | Director, Division of Financial Management |
| Office of the Inspector General 10 CFR §1.12 | | Deputy Inspector General |
| | | Assistant Inspector General for Audits |
| | | Assistant Inspector General for Investigations |
| Office of the General Counsel 10 CFR §1.23 | General Counsel | Director, Commission Adjudicatory Technical Support |
| | Deputy General Counsel | Deputy Assistant General Counsel for Rulemaking and Fuel Cycle |
| | Solicitor | Deputy Assistant General Counsel for Administration |
| | Associate General Counsel for Licensing and Regulation | Assistant General Counsel for Operating Reactors |
| | Assistant General Counsel for Rulemaking and Fuel Cycle | |

Appendix B to opinion of BREYER, J.

| *Office* | *General Position* | *Reserved Position* |
|---|---|---|
| Office of the General Counsel *(Continued)* | Assistant General Counsel for Legal Counsel, Legislation, and Special Projects | |
| | Associate General Counsel for Hearings, Enforcement, and Administration | |
| | Assistant General Counsel for New Reactor Programs | |
| | Assistant General Counsel for Operating Reactors | |
| | Assistant General Counsel for the High-Level Waste Repository Programs | |
| Office of Commission Appellate Adjudication 10 CFR §1.24 | | Director |
| Office of Congressional Affairs 10 CFR §1.27 | Director | |
| Office of Public Affairs 10 CFR §1.28 | Director | |
| Office of International Programs 10 CFR §1.29 | Director | |
| | Deputy Director | |
| Office of Investigations 10 CFR §1.36 | Director | Deputy Director |
| Office of Enforcement 10 CFR §1.33 | Director | |
| Office of Administration 10 CFR §1.34 | Director | Deputy Director |
| | | Director, Division of Contracts |
| | | Director, Division of Administrative Services |
| | | Director, Division of Facilities and Security |
| Office of Human Resources 10 CFR §1.39 | Director | |
| | Deputy Director | |
| | Associate Director for Training and Development | |

Appendix B to opinion of BREYER, J.

| Office | General Position | Reserved Position |
|---|---|---|
| Office of Information Services 10 CFR §1.35 | Director | Deputy Director |
| | | Director, Information and Records Services Division |
| | | Director, High-Level Waste Business and Program Integration Staff |
| | | Director, Business Process Improvement and Applications |
| | | Director, Program Management, Policy Development and Analysis Staff |
| | | Director, Infrastructure and Computer Operations |
| Office of Nuclear Security and Incident Response 10 CFR §1.46 | Director | Deputy Director (2) |
| | | Director, Program Management, Policy Development |
| (Division of Security Policy) | | Director |
| | | Deputy Director |
| | | Project Director, Nuclear Security Policy |
| | | Project Director, Nuclear Security Operations |
| | | Deputy Director for Material Security |
| | | Deputy Director for Reactor Security and Rulemaking |
| (Division of Preparedness and Response) | | Director |
| | | Deputy Director (2) |
| | | Deputy Director for Emergency Preparedness |
| (Division of Security Operations) | | Director |
| | | Deputy Director for Security Oversight |
| | | Deputy Director for Security Programs |
| Office of Nuclear Reactor Regulation 10 CFR §1.43 | Director | Director, Program Management, etc. |
| | Deputy Director | Deputy Director, Program Management, etc. |

Appendix B to opinion of BREYER, J.

| Office | General Position | Reserved Position |
|---|---|---|
| Office of Nuclear Reactor Regulation *(Continued)* | | Associate Director, Operating Reactor Oversight and Licensing |
| | | Associate Director, Risk Assessment and New Projects |
| | | Associate Director, Engineering and Safety Systems |
| (Division of Safety Systems) | | Director |
| | | Deputy Director (2) |
| (Division of License Renewal) | | Director |
| | | Deputy Director |
| (Division of Operating Reactor Licensing) | | Director |
| | | Deputy Director (2) |
| (Division of Inspection and Regional Support) | | Director |
| | | Deputy Director (2) |
| (Division of New Reactor Licensing) | | Director |
| | | Deputy Director (2) |
| (Division of Engineering) | | Director |
| | | Deputy Director (3) |
| (Division of Risk Assessment) | | Director |
| | | Deputy Director (2) |
| (Division of Policy and Rulemaking) | | Director |
| | | Deputy Director (2) |
| (Division of Component Integrity) | | Director |
| | | Deputy Director |
| Office of New Reactors 10 CFR §1.44 | Director | Assistant to the Director for Transition Management |
| Office of Nuclear Material Safety and Safeguards 10 CFR §1.42 | Director | Director, Program Planning, etc. |
| | Deputy Director | |
| (Division of Fuel Cycle Safety and Safeguards) | | Chief, Special Projects Branch |
| | | Chief, Safety and Safeguards Support Branch |
| | | Chief, Fuel Cycle Facilities Branch |

Appendix B to opinion of BREYER, J.

| Office | General Position | Reserved Position |
|---|---|---|
| (Division of Industrial and Medical Nuclear Safety) | | Chief, Rulemaking and Guidance Branch |
| | | Chief, Materials Safety and Inspection Branch |
| (Division of High Level Waste Repository Safety) | | Deputy Director, Licensing and Inspection |
| | | Deputy Director, Technical Review Directorate (2) |
| (Spent Fuel Project Office) | | Deputy Director, Technical Review Directorate |
| | | Deputy Director, Licensing and Inspection |
| Office of Federal and State Materials and Environmental Management Programs 10 CFR §1.41 | Director | Deputy Director |
| | | Director, Program Planning, etc. |
| (Division of Waste Management and Environmental Protection) | | Director |
| | | Deputy Director, Decommissioning (2) |
| | | Deputy Director, Environmental Protection (2) |
| | | Chief, Environmental and Performance Assessment |
| (Division of Materials Safety and State Agreements) | | Director |
| | | Deputy Director |
| (Division of Intergovernmental Liaison and Rulemaking) | | Director |
| | | Deputy Director |
| Office of Nuclear Regulatory Research 10 CFR §1.45 | Director | Director, Program Management, etc. |
| | Deputy Director | Deputy Director for Materials Engineering |
| | Regional Administrator (4) | Deputy Director for Engineering Research Applications |
| | | Deputy Director for New Reactors and Computational Analysis |
| | | Deputy Director for Probabilistic Risk and Applications |

Appendix B to opinion of BREYER, J.

| Office | General Position | Reserved Position |
|---|---|---|
| Office of Nuclear Regulatory Research (*Continued*) | | Deputy Director for Operating Experience and Risk Analysis |
| | | Deputy Director for Radiation Protection, Environmental Risk and Waste Management |
| (Division of Engineering Technology) | | Chief, Generic Safety Issues Branch |
| | | Chief, Electrical, Mechanical, and Materials Branch |
| | | Chief, Structural and Geological Engineering Branch |
| | | Chief, Materials Engineering Branch |
| | | Chief, Engineering Research Applications Branch |
| (Division of Systems Analysis and Regulatory Effectiveness) | | Deputy Director |
| | | Chief, Advanced Reactors and Regulatory Effectiveness |
| | | Chief, Safety Margins and Systems Analysis Branch |
| | | Chief, Radiation Protection, etc. |
| (Division of Risk Analysis and Application) | | Deputy Director |
| | | Chief, Operating Experience Risk Analysis Branch |
| | | Chief, Probabilistic Risk Analysis Branch |
| (Division of Risk Assessment and Special Projects) | | Director |
| | | Assistant Director(2) |
| (Division of Fuel, Engineering and Radiological Research) | | Director |
| | | Assistant Director |
| Office of Small Business and Civil Rights 10 CFR §1.37 | | Director |
| Advisory Committee on Reactor Safeguards 10 CFR §1.13 | Executive Director | Deputy Executive Director |

Appendix B to opinion of BREYER, J.

| Office | General Position | Reserved Position |
|---|---|---|
| Regional Offices 10 CFR §1.47 | | Deputy Regional Administrator (5) |
| | | Director, Division of Fuel Facility Inspection (1) |
| | | Director, Division of Reactor Projects (4) |
| | | Deputy Director, Division of Reactor Projects (5) |
| | | Director, Division of Reactor Safety (4) |
| | | Deputy Director, Division of Reactor Safety (4) |
| | | Director, Division of Nuclear Materials Safety (3) |
| | | Deputy Director, Division of Nuclear Materials Safety |
| | | Deputy Director, Division of Radiation Safety, etc. |
| Social Security Administration (143) | | |
| Office | General Position | Reserved Position |
| Office of the Commissioner 33 Fed. Reg. 5828 (1968) | Executive Counselor to the Commissioner | |
| | Deputy Chief of Staff | |
| | Director for Regulations | |
| | Senior Advisor to the Deputy Commissioner | |
| | Senior Advisor to the Commissioner | |
| Office of International Programs 63 Fed. Reg. 41888 (1998) | Associate Commissioner for International Programs | |
| Office of Executive Operations 56 Fed. Reg. 15888 (1991) | | Assistant Inspector General |
| Office of the Chief Actuary 42 U. S. C. §902(c)(1) 33 Fed. Reg. 5828 | Chief Actuary | |
| | Deputy Chief Actuary, Long-Range | |
| | Deputy Chief Actuary, Short-Range | |

Appendix B to opinion of BREYER, J.

| *Office* | *General Position* | *Reserved Position* |
|---|---|---|
| Office of the Chief Information Officer 33 Fed. Reg. 5829 | Deputy Chief Information Officer | Director, Office of Information Technology Systems Review |
| Office of Information Technology Investment Management | Associate Chief Information Officer | |
| Office of Budget, Finance and Management 60 Fed. Reg. 22099 (1995) | Deputy Commissioner | |
| | Assistant Deputy Commissioner | |
| Office of Acquisition and Grants 60 Fed. Reg. 22099 | Associate Commissioner | |
| Office of Budget 60 Fed. Reg. 22099 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Facilities Management 60 Fed. Reg. 22099 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Financial Policy and Operations 56 Fed. Reg. 15888 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Publications and Logistics Management 60 Fed. Reg. 22099 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Communications 62 Fed. Reg. 9476 (1997) | Assistant Deputy Commissioner | |
| | Press Officer | |
| Office of Communications Planning and Technology 63 Fed. Reg. 15476 | Associate Commissioner | |
| Office of Public Inquiries 62 Fed. Reg. 9477 | Associate Commissioner | |

Appendix B to opinion of BREYER, J.

| Office | General Position | Reserved Position |
|---|---|---|
| Office of Disability Adjudication and Review | Deputy Commissioner | |
| | Assistant Deputy Commissioner | |
| Office of Appellate Operations 53 Fed. Reg. 29778 (1988) | Executive Director | |
| Office of the General Counsel 65 Fed. Reg. 39218 (2000) | Deputy General Counsel | |
| Office of General Law 65 Fed. Reg. 39218 | Associate General Counsel | |
| Office of Public Disclosure 67 Fed. Reg. 63186 (2002) | Executive Director | |
| Office of Regional Chief Counsels 65 Fed. Reg. 39219 | Regional Chief Counsel (7) | |
| Office of Human Resources 60 Fed. Reg. 22128 | Deputy Commissioner | |
| | Assistant Deputy Commissioner | |
| Office of Civil Rights and Equal Opportunity 60 Fed. Reg. 22128 | Associate Commissioner | |
| Office of Labor Management and Employee Relations | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Personnel 60 Fed. Reg. 22128 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Training 60 Fed. Reg. 22128 | Associate Commissioner | |
| Office of the Inspector General 42 U. S. C. §902(e) 60 Fed. Reg. 22133 | Deputy Inspector General | |
| | Counsel to the Inspector General | |

Appendix B to opinion of BREYER, J.

| *Office* | *General Position* | *Reserved Position* |
|---|---|---|
| Office of Audits 60 Fed. Reg. 22133 | Assistant Inspector General for Audit | |
| | Deputy Assistant Inspector General for Audit | |
| Office of Investigations 60 Fed. Reg. 22133 | Assistant Inspector General | |
| | Deputy Assistant Inspector General for Field Investigations | |
| | Deputy Assistant Inspector General for National Investigative Operations | |
| Office of Legislation and Congressional Affairs 60 Fed. Reg. 22152 | Senior Advisor to the Deputy Commissioner | |
| Office of Legislative Development 65 Fed. Reg. 10846 | Associate Commissioner | |
| Office of Operations 60 Fed. Reg. 22107 | Deputy Commissioner | |
| | Assistant Deputy Commissioner | |
| Office of Automation Support 60 Fed. Reg. 22108 | Associate Commissioner | |
| Office of Central Operations 63 Fed. Reg. 32275 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| | Assistant Associate Commissioner | |
| | Assistant Associate Commissioner for Management and Operations Support | |
| Office of Disability Determinations 67 Fed. Reg. 69288 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Electronic Services 66 Fed. Reg. 29618 (2001) | Associate Commissioner | |
| Office of Public Service and Operations Support 59 Fed. Reg. 56511 (1994) | Associate Commissioner | |
| | Deputy Associate Commissioner | |

Appendix B to opinion of BREYER, J.

| *Office* | *General Position* | *Reserved Position* |
|---|---|---|
| Office of Telephone Services 60 Fed. Reg. 22108 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Regional Commissioners 60 Fed. Reg. 22108 | Regional Commissioners (10) | |
| | Deputy Regional Commissioner (10) | |
| | Assistant Regional Commissioner (15) | |
| Office of Retirement and Disability Policy | Deputy Commissioner | |
| | Assistant Deputy Commissioner (2) | |
| | Senior Advisor for Program Outreach | |
| Office of Disability Programs 67 Fed. Reg. 69289 | Associate Commissioner | |
| Office of Employment Support Programs 64 Fed. Reg. 19397 (1999) | Associate Commissioner | |
| Office of Income Security Programs 67 Fed. Reg. 69288 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Medical and Vocational Expertise | Associate Commissioner | |
| Office of Research, Evaluation and Statistics 61 Fed. Reg. 35847 (1996) | Associate Commissioner | |
| Office of Systems 60 Fed. Reg. 22116 | Deputy Commissioner | |
| | Assistant Deputy Commissioner | |
| Office of Disability Systems 61 Fed. Reg. 35849 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Supplemental Security Income Systems 67 Fed. Reg. 37892 | Associate Commissioner | |
| | Deputy Associate Commissioner | |

Appendix B to opinion of BREYER, J.

| *Office* | *General Position* | *Reserved Position* |
|---|---|---|
| Office of Earnings, Enumeration and Administrative Systems 67 Fed. Reg. 37892 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Enterprise Support, Architecture and Engineering 67 Fed. Reg. 37892 | Associate Commissioner | |
| | Deputy Associate Commissioner (2) | |
| Office of Retirement and Survivors Insurance Systems 67 Fed. Reg. 37892 | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Systems Electronic Services 66 Fed. Reg. 10766 (2001) | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Quality Performance 63 Fed. Reg. 32035 | Deputy Commissioner | Chief Quality Officer |
| | Assistant Deputy Commissioner | Deputy Chief Quality Officer |
| | | Deputy Associate Commissioner |
| Office of Quality Data Management | Associate Commissioner | |
| Office of Quality Improvement | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of Quality Review | Associate Commissioner | |
| | Deputy Associate Commissioner | |
| Office of the Chief Strategic Officer 67 Fed. Reg. 79950 | | Chief Strategic Officer |
| **National Labor Relations Board (60)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the Board 29 U. S. C. §153(a) | Director, Office of Representation Appeals and Advice | Executive Secretary |
| | Solicitor | Deputy Executive Secretary |
| | Deputy Chief Counsel to Board Member (4) | Inspector General |
| | | Chief Information Officer |

Appendix B to opinion of BREYER, J.

| *Office* | *General Position* | *Reserved Position* |
|---|---|---|
| Office of the General Counsel 29 U. S. C. §153(d) | Deputy General Counsel | |
| (Division of Enforcement Litigation) | Associate General Counsel | Deputy Associate General Counsel |
| | | Deputy Associate General Counsel, Appellate Court Branch |
| | | Director, Office of Appeals |
| (Division of Advice) | | Associate General Counsel |
| | | Deputy Associate General Counsel |
| (Division of Administration) | | Director |
| | | Deputy Director |
| (Division of Operations Management) | | Associate General Counsel |
| | | Deputy Associate General |
| | | Assistant General Counsel (6) |
| Regional Offices 29 U. S. C. §153(b) | | Regional Director (33) |
| **Federal Energy Regulatory Commission (44)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the Executive Director 18 CFR §1.101(e) (2009) | Executive Director | |
| | Deputy Executive Director | |
| | Deputy Chief Information Officer | |
| Office of General Counsel 18 CFR §1.101(f) | General Counsel | |
| | Deputy General Counsel | |
| | Associate General Counsel (3) | |
| | Deputy Associate General Counsel (4) | |
| | Solicitor | |
| Office of Energy Market Regulation 18 CFR §376.204(b)(2)(ii) | Director | |
| | Deputy Director | |
| | Director, Tariffs and Market Development (3) | |
| | Director, Policy Analysis and Rulemaking | |
| | Director, Administration, Case Management, and Strategic Planning | |

Appendix B to opinion of BREYER, J.

| *Office* | *General Position* | *Reserved Position* |
|---|---|---|
| Office of Energy Projects 18 CFR §376.204(b)(2)(iii) | Director | Director, Dam Safety and Inspections |
| | Principal Deputy Director | |
| | Deputy Director | |
| | Director, Hydropower Licensing | |
| | Director, Pipeline Certificates | |
| | Director, Gas Environment and Engineering | |
| | Director, Hydropower Administration and Compliance | |
| Office of Enforcement 18 CFR §376.204(b)(2)(vi) | Director | Chief Accountant and Director, Division of Financial Regulations |
| | Deputy Director | Chief, Regulatory Accounting Branch |
| | Director, Investigations | |
| | Deputy Director, Investigations | |
| | Director, Audits | |
| | Director, Energy Market Oversight | |
| Office of Electric Reliability 18 CFR §376.204(b)(2)(iv) | Director | |
| | Deputy Director | |
| | Director, Compliance | |
| | Director, Logistics and Security | |
| Office of Administrative Litigation 64 Fed. Reg. 51226 (1999) 68 Fed. Reg. 27056 (2003) | Director | |
| | Director, Technical Division | |
| | Director, Legal Division | |
| | Senior Counsel for Litigation | |
| **Federal Trade Commission (31)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the Chairman 16 CFR §0.8 (2010) | Secretary | |
| Office of the Executive Director 16 CFR §0.10 | Executive Director | Deputy Executive Director |
| | Chief Financial Officer | Chief Information Officer |

Appendix B to opinion of BREYER, J.

| *Office* | *General Position* | *Reserved Position* |
|---|---|---|
| Office of the General Counsel 16 CFR §0.11 | Principal Deputy General Counsel | Deputy General Counsel for Policy Studies |
| | Deputy General Counsel for Litigation | |
| | Deputy General Counsel for Legal Counsel | |
| Office of International Affairs 16 CFR §0.20 | Director | |
| | Deputy Director | |
| Bureau of Competition 16 CFR §0.16 | Associate Director | |
| | Associate Director, Policy | |
| | Assistant Director, Mergers (2) | |
| | Assistant Director, Compliance | |
| Bureau of Consumer Protection 16 CFR §0.17 | Director | Associate Director for International Division |
| | Deputy Director (2) | |
| | Associate Director for Privacy and Identity Protection | |
| | Associate Director for Advertising Practices | |
| | Associate Director for Marketing Practices | |
| | Associate Director for Financial Practices | |
| | Associate Director for Consumer and Business Education | |
| | Associate Director for Planning and Information | |
| | Associate Director for Enforcement | |
| Bureau of Economics 16 CFR §0.18 | Deputy Director for Research and Development and Operations | |
| | Deputy Director for Antitrust | |
| | Associate Director for Consumer Protection and Research | |
| Office of the Inspector General 16 CFR §0.13 | | Inspector General |

Appendix B to opinion of BREYER, J.

| Consumer Product Safety Commission (16) | | |
|---|---|---|
| *Office* | *General Position* | *Reserved Position* |
| Office of the Executive Director 16 CFR §1000.18 (2010) | Deputy Executive Director | Assistant Executive Director for Compliance and Administrative Litigation |
| | Chief Financial Officer | Associate Executive Director for Field Operations |
| | | Executive Assistant |
| Office of Compliance and Field Operations 16 CFR §1000.21 | Deputy Director | |
| Office of Hazard Identification and Reduction 16 CFR §1000.25 | | Assistant Executive Director |
| | | Deputy Assistant Executive Director |
| | | Associate Executive Director for Economic Analysis |
| | | Associate Executive Director for Engineering Sciences |
| | | Associate Executive Director for Epidemiology |
| Directorate for Health Sciences 16 CFR §1000.27 | Associate Executive Director | |
| Directorate for Laboratory Sciences 16 CFR §1000.30 | Associate Executive Director | |
| Office of International Programs and Intergovernmental Affairs 16 CFR §1000.24 | | Director |
| Office of Information and Technology Services 16 CFR §1000.23 | | Assistant Executive Director |
| Office of the General Counsel 16 CFR §1000.14 | General Counsel | |
| Federal Labor Relations Authority (14) | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the Chairman 5 CFR §2411.10(a) (2010) | | Director, Human Resources, Policy and Performance Management |
| | | Chief Counsel |
| | | Senior Advisor |

Appendix B to opinion of BREYER, J.

| *Office* | *General Position* | *Reserved Position* |
|---|---|---|
| Office of the Solicitor 5 CFR §2417.203(a) | | Solicitor |
| Offices of Members 5 U. S. C. §7104(b) | | Chief Counsel (2) |
| Office of the Executive Director 5 U. S. C. §7105(d) 5 CFR §2421.7 | | Executive Director |
| Federal Services Impasses Panel 5 U. S. C. §7119(c) | | Executive Director |
| Office of the General Counsel 5 U. S. C. §7104(f) | | Deputy General Counsel |
| Regional Offices 5 U. S. C. §7105(d) 5 CFR §2421.6 | | Regional Director (5) |
| **National Transportation Safety Board (14)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the Managing Director 49 CFR §800.2(c) (2009) | | Managing Director |
| | | Associate Managing Director for Quality Assurance |
| Office of the General Counsel 49 CFR §800.2(c) | General Counsel | |
| Office of Administration 60 Fed. Reg. 61488 | | Director |
| | | Director, Bureau of Accident Investigation |
| Office of Aviation Safety 49 CFR §800.2(e) | | Deputy Director, Technology and Investment Operations |
| | | Deputy Director, Regional Operations |
| Office of Research and Engineering 49 CFR §800.2(j) | | Director |
| | | Deputy Director |
| Office of Chief Financial Officer 49 U. S. C. §1111(h) 49 CFR §800.28 | | Chief Financial Officer |
| Office of Safety Recommendations and Accomplishments 49 CFR §800.2(k) | | Director |

Appendix B to opinion of BREYER, J.

| *Office* | *General Position* | *Reserved Position* |
|---|---|---|
| Office of Railroad, Pipeline and Hazardous Materials Investigations 49 CFR §§800.2(f), (i) | | Director |
| National Transportation Safety Board Academy 49 U. S. C. §1117 | | Director |
| | | President and Academic Dean |
| **Performance-Based Organization for the Delivery of Federal Student Financial Assistance (13)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the Chief Operating Officer 20 U. S. C. §§1018(d)–(e) | Deputy Chief Operating Officer | Director, Student Aid Awareness |
| | Chief Financial Officer | |
| | Chief Compliance Officer | |
| | Director, Policy Liaison and Implementation Staff | |
| | Audit Officer | |
| | Director, Financial Management Group | |
| | Director, Budget Group | |
| | Deputy Chief Information Officer | |
| | Director, Application Development Group | |
| | Internal Review Officer | |
| | Director, Strategic Planning and Reporting Group | |
| | Senior Adviser | |
| **Merit Systems Protection Board (11)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the Clerk of the Board 5 CFR §1200.10(a)(4) (2010) | | Clerk of the Board |
| Office of Financial and Administrative Management 5 CFR §1200.10(a)(8) | | Director |
| Office of Policy and Evaluation 5 CFR §1200.10(a)(6) | | Director |

Appendix B to opinion of BREYER, J.

| Office | General Position | Reserved Position |
|---|---|---|
| Office of Information Resources Management 5 CFR §1200.10(a)(9) | | Director |
| Office of Regional Operations 5 CFR §1200.10(a)(1) | | Director |
| | | Regional Director (6) |
| **Office of Special Counsel (8)** | | |
| Office | General Position | Reserved Position |
| Office of Special Counsel 5 U. S. C. §1211 | Deputy Special Counsel | Associate Special Counsel for Investigation and Prosecution (3) |
| | | Senior Associate Special Counsel for Investigation and Prosecution |
| | | Associate Special Counsel, Planning and Oversight |
| | | Associate Special Counsel for Legal Counsel and Policy. |
| | | Director of Management and Budget |
| **Postal Regulatory Commission (10)*** | | |
| Office | General Position | Reserved Position |
| Office of the General Counsel 39 CFR §3002.13 (2009) | General Counsel | |
| | Assistant General Counsel | |
| Office of Accountability and Compliance | Director | |
| | Assistant Director, Analysis and Pricing Division | |
| | Assistant Director, Auditing and Costing Division | |
| Office of Public Affairs and Governmental Relations 39 CFR §3002.15 | Director | |

_____

\*The officers in this agency are part of the "excepted service," but enjoy tenure protection similar to that enjoyed by career SES appointees. See 5 U. S. C. §2302(a)(2)(B); Plum Book, p. v (distinguishing "excepted service" from "Schedule C"); *id.*, at 202 (describing schedule C positions).

Appendix B to opinion of BREYER, J.

| *Office* | *General Position* | *Reserved Position* |
|---|---|---|
| Office of the Secretary and Administration 48 Fed. Reg. 13167 (1983) | Secretary and Director | |
| | Assistant Director, Human Resources and Infrastructure | |
| | Assistant Director, Strategic Planning, etc. | |
| Office of the Inspector General 39 CFR §3002.16 | Inspector General | |
| **Federal Maritime Commission (8)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the Managing Director 46 CFR §501.3(h) (2010) 75 Fed. Reg. 29452 | Director | |
| Office of the Secretary 46 CFR §501.3(c) | | Secretary |
| Office of the General Counsel 46 CFR §501.3(d) | | Deputy General Counsel for Reports, Opinions and Decisions |
| Bureau of Certification and Licensing 46 CFR §501.3(h)(5) | | Director |
| Bureau of Trade Analysis 46 CFR §501.3(h)(6) | | Director |
| Bureau of Enforcement 46 CFR §501.3(h)(7) | | Director |
| | | Deputy Director |
| Office of Administration 70 Fed. Reg. 7660 (2005) | | Director |
| **Surface Transportation Board (4)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the Chairman 49 CFR §1011.3 (2009) | Director of Public Assistance, Governmental Affairs and Compliance | |
| Office of the General Counsel 49 CFR §1011.6(c)(3) | General Counsel | |
| | Deputy General Counsel | |
| Office of Proceedings 49 CFR §1011.6(h) | Director | |

Appendix B to opinion of BREYER, J.

| Federal Mine Safety and Health Review Commission (1) | | |
|---|---|---|
| *Office* | *General Position* | *Reserved Position* |
| Office of the General Counsel 29 CFR §2706.170(c) (2009) | General Counsel | |
| **Chemical Safety and Hazard Investigation Board (1)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the General Counsel 40 CFR §1600.2 (b)(3) (2009) | General Counsel | |
| **National Mediation Board (1)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the General Counsel 29 CFR §1209.06(e) (2009) | General Counsel | |
| **Commission on Civil Rights (1)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the Staff Director 42 U. S. C. §1975b(a)(2)(A) | Associate Deputy Staff Director | |
| **Board of Veterans Appeals (1)** | | |
| *Office* | *General Position* | *Reserved Position* |
| Office of the Vice Chairman 38 U. S. C. §7101(a) | | Vice Chairman |

68  FREE ENTERPRISE FUND *v.* PUBLIC COMPANY
ACCOUNTING OVERSIGHT BD.

Appendix C to opinion of BREYER, J.

C

According to data provided by the Office of Personnel Management, reprinted below, there are 1,584 administrative law judges (ALJs) in the Federal Government. Each of these ALJs is an inferior officer and each is subject, by statute, to two layers of for-cause removal. See *supra,* at 30. The table below lists the 28 federal agencies that rely on ALJs to adjudicate individual administrative cases. The source is available in the Clerk of Court's case file. See *ibid.*

| AGENCY | TOTAL NUMBER OF ALJs |
|---|---|
| Commodity Futures Trading Commission | 2 |
| Department of Agriculture | 4 |
| Department of Education | 1 |
| Department of Health and Human Services (Departmental Appeals Board) | 7 |
| Department of Health and Human Services (Food and Drug Administration) | 1 |
| Department of Health and Human Services (Office of Medicare Hearings and Appeals) | 65 |
| Department of Homeland Security (United States Coast Guard) | 6 |
| Department of Housing and Urban Development | 2 |
| Department of the Interior | 9 |
| Department of Justice (Drug Enforcement Administration) | 3 |
| Department of Justice (Executive Office for Immigration Review) | 1 |
| Department of Labor (Office of the Secretary) | 44 |
| Department of Transportation | 3 |
| Environmental Protection Agency | 4 |
| Federal Communications Commission | 1 |

Appendix C to opinion of BREYER, J.

| AGENCY | TOTAL NUMBER OF ALJs |
|---|---|
| Federal Energy Regulatory Commission | 14 |
| Federal Labor Relations Authority | 3 |
| Federal Maritime Commission | 1 |
| Federal Mine Safety and Health Review Commission | 11 |
| Federal Trade Commission | 1 |
| International Trade Commission | 6 |
| National Labor Relations Board | 39 |
| National Transportation Safety Board | 4 |
| Occupational Safety and Health Review Commission | 12 |
| Office of Financial Institution Adjudication | 1 |
| Securities and Exchange Commission | 4 |
| Social Security Administration | 1,334 |
| United States Postal Service | 1 |
| **TOTAL** | **1,584** |

## D

The table below lists 29 departments and other agencies the heads of which are *not* subject to any statutory for-cause removal provision, but that do bear certain other indicia of independence.

The table identifies six criteria that may suggest independence: (1) whether the agency consists of a multi-member commission; (2) whether its members are required, by statute, to be bipartisan (or nonpartisan); (3) whether eligibility to serve as the agency's head depends on statutorily defined qualifications; (4) whether the agency has independence in submitting budgetary and other proposals to Congress (thereby bypassing the Office of Management and Budget); (5) whether the agency has authority to appear in court independent of the Department of Justice, cf. 28 U. S. C. §§516–519; and (6) whether the agency is explicitly classified as "independent" by statute. See generally Breger & Edles 1135–1155; *supra,* at 35–36. Unless otherwise noted, all information refers to the relevant agency's organic statute, which is cited in the first column. The list of agencies is nonexhaustive.

| Department or Agency | Multi-Member | Bi-partisan | Statutory Eligibility Criteria | OMB Bypass | Litigation Authority | Explicit Statement |
|---|---|---|---|---|---|---|
| Securities and Exchange Commission 15 U. S. C. §78d | Yes | Yes | | Yes 12 U. S. C. §250 | Yes 15 U. S. C. §78u | |
| Architectural and Transportation Barriers Compliance Board 29 U. S. C. §792 | Yes | | Yes (related experience) | | Yes | |
| Arctic Research Commission 15 U. S. C. §4102 | Yes | | Yes (related knowledge, experience) | | | |

Appendix D to opinion of BREYER, J.

| Department or Agency | Multi-Member | Bi-partisan | Statutory Eligibility Criteria | OMB Bypass | Litigation Authority | Explicit Statement |
|---|---|---|---|---|---|---|
| Broadcasting Board of Governors 22 U. S. C. §6203 | Yes | Yes | Yes (citizenship; related knowledge) | | | Yes |
| Central Intelligence Agency 50 U. S. C. §403–4 | | | | | | Cf. *Freytag,* 501 U. S., at 887, n. 4 |
| Commission of Fine Arts 40 U. S. C. §9101 | Yes | | Yes (related knowledge) | | | |
| Commodity Futures Trading Commission 7 U. S. C. §2(a)(2) | Yes | Yes | Yes (related knowledge) | | Yes §2(a)(4) | Yes |
| Defense Nuclear Facilities Safety Board 42 U. S. C. §2286 | Yes | Yes | Yes (citizenship; expert knowledge) | | | Yes |
| Equal Employment Opportunity Commission 42 U. S. C. §2000e–4 | Yes | Yes | | | Yes §2000e–5(f) | |
| Export-Import Bank of the United States* 12 U. S. C. §635a | Yes | Yes | | | Yes §635(a)(1) | Yes |
| Farm Credit Administration 12 U. S. C. §§2241, 2242 | Yes | Yes | Yes (citizenship) | | Yes §2244(c) | Yes |
| Federal Communications Commission 47 U. S. C. §§151, 154 | Yes | Yes | Yes (citizenship) | | Yes §401(b) | |
| Federal Deposit Insurance Corporation 12 U. S. C. §§1811, 1812 | Yes | Yes | Yes (citizenship; related experience) | Yes §250 | Yes §1819(a) | |

---

*See *Lebron,* 513 U. S. 374.

Appendix D to opinion of BREYER, J.

| Department or Agency | Multi-Member | Bi-partisan | Statutory Eligibility Criteria | OMB Bypass | Litigation Authority | Explicit Statement |
|---|---|---|---|---|---|---|
| Federal Election Commission 2 U. S. C. §437c | Yes | Yes | Yes (general) | Yes §437d(d) | Yes §437d (a)(6) | |
| Federal Housing Finance Agency 12 U. S. C. A. §4511 (Supp. 2010) | | | | Yes §250 | | Yes |
| Federal Retirement Thrift Invest-ment Board 5 U. S. C. §8472 | Yes | Cf. §8472(b) (2) | Yes (related knowledge) | | | |
| International Trade Commission 19 U. S. C. §1330 | Yes | Yes | Yes (citizenship; expert knowledge) | Yes §2232 | Yes §1333(g) | Yes |
| Marine Mammal Commission 16 U. S. C. §1401 | Yes | | Yes (related knowledge) | | | |
| Millennium Challenge Corporation† 22 U. S. C. §7703 | Yes | Cf. §7703(c) (3)(B) | Yes (related experience) | | | |
| National Credit Union Administration 12 U. S. C. §1752a | Yes | Yes | Yes (related experience) | Yes §250 | | Yes |
| National Archives and Records Administration 44 U. S. C. §§2102, 2103 | | Yes | Yes (related knowledge) | | | Yes |
| National Council on Disability 29 U. S. C. §780 | Yes | | Yes (related experience) | | | |
| National Labor-Management Panel 29 U. S. C. §175 | Yes | | Yes (related knowledge) | | | |

---

† See *Lebron, supra.*

Appendix D to opinion of BREYER, J.

| Department or Agency | Multi-Member | Bi-partisan | Statutory Eligibility Criteria | OMB Bypass | Litigation Authority | Explicit Statement |
|---|---|---|---|---|---|---|
| National Science Foundation 42 U. S. C. §§1861, 1863, 1864 | Yes | | Yes (related expertise) | | | Yes |
| Peace Corps 22 U. S. C. §2501–1 | | | | | | Yes |
| Pension Benefit Guaranty Corporation‡ 29 U. S. C. §1302 | Yes | | | | Yes | |
| Railroad Retirement Board 45 U. S. C. §231f | Yes | | | | Yes | Yes |

_____

‡ See *Lebron, supra.*